Judge Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | NO.   CR10-0310RAJ |
| | ) | |
| v. | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| FREDERICK DARREN BERG, | ) | |
| Defendant. | ) | |
| | ) | |

## I.   INTRODUCTION

Sentencing is scheduled for Thursday February 9, 2012, at 9:00 a.m.  Pursuant to the terms of the 11(c)(1)(C) plea agreement, the government recommends a sentence of 216 months (18 years) in prison followed by three years supervised release with all the conditions of supervision recommended by U.S. Probation.  The government has no objections to the factual recitations in the Final Presentence Report.  Defendant filed several objections to the facts and conclusions in the draft presentence report including the loss amount, the number of victims, and the enhancements for obstruction of justice, sophisticated means, making a misrepresentation in a bankruptcy proceeding, and abuse of trust.  The government believes defendant's objections may be resolved without an evidentiary hearing based on the facts admitted in the plea agreement, the undisputed facts in the pre-sentence report, and the attachments and declarations submitted with this memorandum.  In addition, as part of his plea agreement, defendant waived his right to appeal the sentence or conviction, including any restitution order imposed and any terms of supervised release imposed should the Court impose the agreed sentence of 18 years.

GOVERNMENT'S SENTENCING MEMORANDUM/ — 1
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**II.     FACTUAL BACKGROUND**

      **A.     Mr. Berg's History and Characteristics**

      Defendant, Frederick Darren Berg, is a forty-nine year old former resident of Mercer Island, Washington with a criminal history that includes a Federal bank fraud conviction in the District of Oregon in 1987, as well as a history of investigations for similar fraudulent conduct including a 1987 check-kiting investigation by the FBI, and allegations that he embezzled thousands of dollars from fraternity at the University of Oregon while acting as the treasurer.  After dropping out of college around the same time, Mr. Berg worked in a variety of capacities in the real estate industry, advertising, tourism, and sales.  Mr. Berg appears to have had a difficult childhood with an abusive father, and eventually took the name of his step father.  However, Mr. Berg remains close with his mother and sisters.  Despite his questionable past, he managed to establish a successful mortgage investment firm that operated for a number of years before Mr. Berg began stealing from his investors.

      Mr. Berg has been in custody for the instant offense since October 2010.  He has spent much of that time casting blame on others for the massive fraud that he committed.  Over the past several months, in a series of e-mails to friends, family and a reporter for the Seattle Times, Mr. Berg has claimed he is writing a book to "expose" the misdeeds of the bankruptcy trustees who he claims increased the losses to his hundreds of victims.  In what he describes as a prologue to the book, Mr. Berg casts blame on others for the results of his crime spree and appears to show only token remorse for his actions.  (*See* Attachment A).

      **B.     The Nature and Circumstances of the Offense**

      Mr. Berg's offense involved a series of investment funds that he operated between early 2001 and approximately June 2010, when they were forced into involuntary bankruptcy because Mr. Berg had looted the funds for years and could no longer cover recurring interest payments and redemption requests.  Over the course of approximately ten years, Mr. Berg created a series of investment funds that were purportedly established

to invest in the purchase of seller-financed real estate mortgages.  Seller-financed real estate mortgages are mortgage loans backed by real estate in which the seller of the property holds the note and receives mortgage payments from the buyer.  In some instances, sellers holding these types of loans decide to sell the notes at a discount in order to receive cash up front rather than a stream of income over many years.  Mr. Berg's investment funds were primarily designed to invest in these types of mortgages on behalf of a pool of investors.  Although Mr. Berg initially used investor funds for their stated purposes - to purchase and fund mortgage backed loans - he also stole over $100 million from his investors and used those funds for a variety of personal expenses and to continue his scheme by covering recurring payments to other investors.

Mr. Berg first started investing in seller-financed real estate mortgages after moving to Seattle, Washington in approximately 1987.  According to Mr. Berg, he and three friends founded Meridian Partnership Management in 1987, after he first learned about the seller-financed real estate loan market.  (*See* Attachment B, Transcript of Recorded Interview with Darren Berg dated September 20th, 2010 at 5-9, hereinafter "Tr.").  Those in the business of buying seller-financed mortgages can make a profit on the discount they pay for the loan.  Investing in the purchase of seller-financed mortgage loans, however, is an extremely risky investment that requires extensive knowledge of the relevant real estate market.  Seller-financed loans are often loans made to borrowers who could not obtain traditional financing because of credit problems, questionable land values, or other deficiencies that disqualify the borrower from traditional bank and mortgage lender financing.  Investing in seller-financed real estate loans requires a very specialized skill set that is not available to the typical investor because of the relatively small market and the lack of collective information on the size of the market.   In other words, it has all the makings of a good myth that an experienced con-man can work to his advantage.

Throughout the 1990's, Mr. Berg's firm, Meridian Mortgage Investors, located lenders who were holding seller-financed real estate mortgages that they wished to

GOVERNMENT'S SENTENCING MEMORANDUM/ — 3
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

liquidate.  (Tr. at 9-10).  According to Mr. Berg, his firm initially brokered the purchase of these loans primarily for Metropolitan Mortgage, a Spokane based mortgage investment company that went bankrupt in 2004.  (Tr. 10-13, 20-22).  Beginning around 1995, Mr. Berg began brokering loans to Orchard Bank, a small Oregon bank that invested heavily in the purchase of seller-financed real estate loans for several years.  (Tr. 20-22).  Meridian also brokered a smaller number of loans to private investors who were experienced in this niche loan market.  (*Id*.)  Mr. Berg's firm conducted due-diligence on the loans, determined the best discount price to offer the lender for the loan and, if the lender accepted the price, Mr. Berg would broker the sale of the loan to another investor.  By all accounts, this business operated successfully for several years and was exceptionally successful in the late 1990's when Orchard Bank became Meridian's primary buyer of notes.  In 1999, however, Orchard Bank was sold and the new bank owners decided to leave the seller-financed loan market.

As Meridian lost its primary buyer of notes, Mr. Berg came up with a plan to raise capital through his own series of investment funds for the purpose of purchasing seller-financed mortgage loans.  Between January 2001 and August 2010, Mr. Berg created and operated a series of investment funds purportedly for the purpose of investing in seller financed real estate contracts, hard money loans, real estate and mortgage backed securities.  These funds were known as: Meridian Mortgage Investors Funds 1, 2, 3, 5, 6, 7, 8, 9, and 10 (the mortgage investment funds); Meridian Real Estate Opportunity Funds 1 and 2 (the real estate investment funds); and CS Note Holdco (the mortgage backed security investment fund).  The mortgage investment funds were purportedly established to primarily invest in the purchase of seller financed real estate contracts and to fund short term loans backed by mortgages on real property.  Payments to investors in the mortgage investment funds were purportedly to be made from the cash flows generated by borrower payments.

Mr. Berg opened his first three investment funds, Meridian Mortgage Investors Funds 1, 2, and 3, in early 2001 and began soliciting investors.  Unfortunately, Mr. Berg

GOVERNMENT'S SENTENCING MEMORANDUM/ — 4
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

began these funds at the same time the pool of seller-financed real estate loans began to dry up. (Tr. at 13-14). As the traditional mortgage lending industry loosened its lending standards and interest rates declined, many borrowers with seller-financed mortgages were able to re-finance their loans with traditional banks. According to former Meridian employees, at the same time Mr. Berg opened his investment funds, the volume of calls from people who wished to sell their real-estate notes began to decline and the quality of loans available for purchase likewise declined. One former employee told the government that in late 2000 and early 2001, the decline in interest rates "killed the private mortgage industry" and many national buyers of seller-financed loans went out of business. Mr. Berg later explained that "at the same time that you're doing this, the seller finance business is dying." (Tr. at 111).

Mr. Berg, however, was wildly successful in raising capital. Despite the decline in the availability of quality seller-financed real-estate loans, Mr. Berg promoted his investment funds with promises that his firm could invest in millions of dollars worth of high-quality loans that were at a very low risk of default. For example, Mr. Berg frequently told investors that his firm primarily invested in loans with a maximum loan-to-value of 60%, while typical bank financed mortgages allowed up to 80% loan-to-value. Mr. Berg told his investors that the high standards Meridian applied in its loan underwriting process made the likelihood of default on his loans extremely low. Throughout the entire course of his investment funds, Mr. Berg routinely assured his victims that their investments were safe from the typical market forces that might negatively impact other loan portfolios.

As a result of Mr. Berg and his promoters' successful efforts to raise investment funds, Mr. Berg said he quickly became alarmed at the rate of investments flowing into his funds. He stated that he was raising money faster than he could invest it, and that he "found out very quickly that I was being snowed under in money that I couldn't spend very quickly." (Tr. 55). Mr. Berg said there simply were not enough high quality seller-financed real estate contracts in existence to support the amount of money coming

GOVERNMENT'S SENTENCING MEMORANDUM/ — 5
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   into his investment funds.

2      With millions of dollars in cash flowing into his investment funds and an

3   insufficient supply of quality loans to purchase, Mr. Berg admitted he began using his

4   investors' money for other purposes as early as 2003.  (Tr. 48).  When asked why he

5   didn't simply stop raising money, or send the money back to his investors, Mr. Berg

6   responded "there's only one thing you can do to make people madder than being in a deal

7   that blows up, and that's being in a deal where you just send them all their money back.

8   You know, you can't just send everybody their money -- you can't just send everybody

9   their money back.  You can't - -."  (Tr. 93).  Upon reflection, however, Mr. Berg

10  commented "I look back on that now and I think that's probably bullshit."  (Tr. 94).

11     Initially, the misappropriations were limited to gifts to family and friends and an

12  occasional large personal expense such as his February 2002 purchase of a 53' yacht with

13  funds stolen directly from the bank account for Meridian Mortgage Investor's Fund 2.

14  (*See* Declaration of Special Agent Carrie Nordyke, Exhibit 1; Tr. at pages 46, 98).

15  However, by early 2003, Mr. Berg began stealing from Fund 2 to start his bus company --

16  MTR Western – purchasing buses with money wired directly out of the investment fund

17  accounts.  (Tr. 46-49; Nordyke Declaration Exhibit 1).  Funds for many personal expenses

18  including the bus company, however, were often laundered first through his personal

19  bank accounts instead of directly from the funds' accounts.

20     According to the bankruptcy trustee, Mr. Berg diverted approximately $50.6

21  million from his investment funds without his victim's knowledge or permission for the

22  purchase of busses and the operation of MTR Western and several subsidiary bus

23  companies between 2003 and 2010.  In the last two years of the fund's operations,

24  however, Mr. Berg returned approximately $5.7 million from the bus companies to the

25  investment funds and used that money to pay investor interest payments and redemptions.

26  Therefore, the net amount of investors funds that were diverted to the bus company was

27  ultimately $45 million.

28

GOVERNMENT'S SENTENCING MEMORANDUM/ — 6
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    While the bus company consumed a significant portion of the stolen investor

2  funds, Mr. Berg also spent his investors' money on a variety of other personal expenses.

3  According to Mr. Berg, "from a personal perspective, the two biggest cash drains . . .

4  airplanes and house." (Tr. 98).  During the ten years that Mr. Berg operated his

5  investment funds, he purchased: a $1.95 million condominium at Second and Union in

6  Seattle (Tr. 46); a $1.25 million house in La Quinta, California (Tr. 96); a $1.4 million

7  condominium in San Francisco, California; and a $5.475 million waterfront home on

8  Mercer Island for which he spent at least an additional $5 million to remodel (*see*

9  Attachment C).  The forensic analysis of Mr. Berg's bank accounts further showed that

10  between 2001 and 2010, he spent at least $5.5 million on the purchase and operation of

11  two Lear jets (*see* Attachment D), and at least $3.6 million on the purchase, operation and

12  frequent modification of several yachts.  (*See* Attachment E).  Mr. Berg also had

13  extraordinary monthly living expenses for things such as gardening, clothes, restaurants

14  and travel.

15    Mr. Berg stated that in 2004, he sought to control the inflow of cash into his funds

16  by closing Funds 1 and 3, and creating a new series of replacement funds with a method

17  of compensation for his fund promoters designed to limit the excess cash.  Because he

18  had already stolen money from Fund 2, however, Mr. Berg said "there was no liberty to

19  close fund two . . . the bus company owed it money" and, therefore, the fund simply did

20  not have sufficient assets to cover the money he owed to investors.  (Tr. 64).  He went on

21  to explain that because Fund 2 was "not collateralized with that number of assets, at least

22  not mortgage assets and real estate assets . . . I'm not at liberty to close that fund." (Tr.

23  72-73).  Instead of mortgages and real estate, Fund 2 owned a bus company and "some

24  other things." (Tr. 72).

25    After establishing his new funds with his new compensation models that would

26  supposedly stop the excess cash flows, Mr. Berg said the new funds operated legitimately

27  for a couple years.  He admitted, however, that starting the bus company became a

28  problem for him.  According to Mr. Berg, it was "growing rapidly" and "consuming

GOVERNMENT'S SENTENCING MEMORANDUM/ — 7
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  unreal amounts of cash." (Tr. 75). In addition, beginning sometime between 2005 and

2  2007, Mr. Berg's funds began accepting large infusions of cash from institutional

3  investors who, "just start again snowing us under in money. And we're raising money

4  faster than we could spend it again." (Tr. 81). Mr. Berg said the attention from large

5  investors who put millions of dollars into the funds, again put him in a position where he

6  could not find enough assets to purchase. (Tr. 106-107).

7       While looting the funds, Mr. Berg perpetuated his scheme by paying interest and

8  redemption payments to older investors with new funds he raised from incoming

9  investors in a classic Ponzi scheme. In order to conceal his fraud scheme and the thefts

10  from the investment funds, Mr. Berg engaged in a variety of accounting frauds to deceive

11  his investors and outside auditors. (Tr. 128-142). Among other things, he booked

12  fictitious loans on the financial records for Meridian. (Tr. at 128). He also kept loans on

13  the books after they had been paid off and in many instances stole the proceeds of loan

14  payoffs rather than returning the money to the investment funds for the purchase of new

15  loans. (*Id.*) Mr. Berg told investigators and the bankruptcy trustee that he generated all

16  the loan files and loan servicing files for the "fake" loans used to deceive his auditors.

17  (Tr. at 133-134). According to Mr. Berg, "I would work all night for probably two

18  months leading up to the audit, two months, every weekend, 18 hours a day, creating files

19  that literally contained everything that the real files contained, credit reports, title reports,

20  appraisals." (Tr. 133).

21       Exacerbating his troubles, in 2009, one of Mr. Berg's largest investors requested a

22  redemption of their investment that Mr. Berg was unable to cover because of his thefts

23  from the funds. In approximately January 2009, Cornerstone Investments, an investment

24  fund that had placed $30 million with Mr. Berg just six months earlier in June 2008,

25  began asking to liquidate their investments. According to Mr. Berg, "the first call was $4

26  million or $5 million. We meet it. Now we still owe them $25 million or $26 million.

27  We can't meet the second call which comes along in June [2009]." (Tr. 182). Rather

28  than come clean at that point and confess his fraud as he eventually did, Mr. Berg's first

GOVERNMENT'S SENTENCING MEMORANDUM/ — 8
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

instinct was to begin protecting his ill-gotten gains – particularly his prized bus company and his Mercer Island home – by contacting an attorney who specializes in offshore asset protection trusts. Mr. Berg contacted attorney Mary Simon via e-mail and told her "I desire to form the most aggressive asset protecting trust available." (Tr. 200-205). Over the next twelve months, every time Mr. Berg began to feel threatened with a collapse of his scheme, he would reconnect with Ms. Simon to reinstate his efforts to hide the bus company and other assets from the victims.

As a result of Mr. Berg's failure to meet the redemption request, Cornerstone hired a consultant to conduct a review of Mr. Berg and Meridian that quickly led them to the conclusion that Mr. Berg was running a Ponzi scheme. In September 2009, Cornerstone initiated litigation in King County Superior Court alleging Mr. Berg had already admitted using new loan monies to pay earlier investors rather than to finance the legitimate purchases of mortgages. (*See* Attachment F; Tr. 182-183).

Mr. Berg, however, had started creating a series of new investment funds designed solely to raise more money to support his Ponzi scheme. (Tr. 184-190). In March 2009, Mr. Berg started a new investment fund called Meridian Real Estate Fund I, that was purportedly going to invest in real estate that had been devalued because of the recession. Instead, Mr. Berg used this fund to raise an additional $7 million between March 2009, and June 2010, that he used to prop up his Ponzi scheme. Four months later, in July 2009, Mr. Berg started another investment company called CS Note Holdco that was purportedly going to purchase Cornerstone's investment notes at a 30% discount. (Tr. 184-185). Instead, Mr. Berg simply used the $4.055 million raised from investors in CS Note Holdco wherever he needed to continue the Ponzi scheme and fund his lifestyle. Mr. Berg also started a second Real Estate fund, but fortunately that fund only managed to steal another $764,000.00 before the scheme collapsed. Finally, in November 2009, after Cornerstone had filed its lawsuit, Mr. Berg opened two new Mortgage Investment funds, Meridian Mortgage Investors Funds 9 and 10. As with CS Note Holdco and the Real Estate fund, these too were established solely to perpetuate the Ponzi scheme. All

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

told, between March 2009, and August 2010, Mr. Berg managed to steal another $16 million in his "survival mode" attempt to salvage the scheme. According to Mr. Berg, during these last two years of the scheme, almost every dollar he raised from his investors went straight to other investors in the form of interest payments or redemptions. (Tr. 172).

Despite the imminent collapse of his scheme, as late as March 2009, Mr. Berg was meeting with investors to assure them of the continued health of his investment funds. (*See* Attachment I). During video recorded presentations to investors, Mr. Berg said that Meridian had successfully avoided the bad economic conditions affecting the real estate industry and assured his investors that their money was safe. Mr. Berg told the investors that because of Meridian's careful loan selection criteria, borrowers were not defaulting on loans held by Meridian. He told his investors he was "having fun in this economy" and that delinquencies in the Meridian loan portfolio were down. In a telling sign of the troubles to come, however, Mr. Berg commented that "what keeps me up at night is that you all are gonna freak out" and make a "run on the bank." Yet, he claimed Meridian was buying more loans and that the quality of the loans they were purchasing was going up.

By June 15, 2010, Mr. Berg was unable to keep up with the monthly interest payments and missed another large payment to Cornerstone. Mr. Berg then spent several weeks avoiding investors and telling a variety of lies to the investors to cover his scheme. On July 9, 2010, investors in Funds 2, 5, 7, and 8 initiated actions to force the funds into involuntary Chapter 11 bankruptcy. *See In Re: Meridian Mortgage Investors Funds II-X*, Case Number 10-17952 (Bankr. W.D. Wash.). That bankruptcy case eventually included all of the funds with the exception of CS Note Holdco.

Over the course of the next two months, Mr. Berg provided extensive information to the bankruptcy trustee about the scope of his fraud. At the same time, however, he repeatedly delayed meeting with the government and engaged in a pattern of obstructive conduct. Mr. Calvert and his staff contacted the government repeatedly because Mr. Berg

GOVERNMENT'S SENTENCING MEMORANDUM/ — 10
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  was preventing them from gaining full access to the records necessary for their

2  investigation.  Among the challenges they encountered were:  Mr. Berg's initial refusal to

3  surrender control of certain bank accounts; Mr. Berg's initial refusal to surrender control

4  over the post office box that received the mail for all of his companies including the

5  investment funds; Mr. Berg's efforts to open and fund new bank accounts without their

6  knowledge; Mr. Berg's initial refusal to provide access to banking records for Meridian

7  Partnership Management and MPM Investor Services; and incomplete access to records

8  of other Meridian companies that had received illegal transfers of money from the

9  investment funds.

10       After eventually meeting with the government and giving a four-hour interview in

11  which he detailed the history of his fraud, by late September 2010, Mr. Berg appeared

12  ready to truly cooperate and accept responsibility.  On the afternoon of October 13, 2010,

13  however, a consultant working with bankruptcy trustee Diana Carey who had control over

14  Mr. Berg's personal estate, contacted the FBI with new information that showed Mr. Berg

15  was continuing to conceal assets and lie to both the bankruptcy trustees and the

16  government.  (*See* Complaint at Pages 29-34).  Follow-up investigation by the FBI

17  revealed Mr. Berg had concealed approximately $400,000.00 in proceeds from the sale of

18  real estate and opened new bank accounts to hide these funds.  He used this money for a

19  variety of personal expenses including lease payments on a Porsche Cayenne and Porsche

20  911 Turbo Cabriolet, twelve months advance rent on a Los Angeles apartment, the

21  purchase of an Audi S5 convertible, a retainer for a criminal defense attorney, and

22  insurance on jet skis and his yacht.  As a result, the government obtained an arrest warrant

23  and sought Mr. Berg's detention.

24       Despite the slew of problems that the trustees experienced with Mr. Berg,

25  including his lies, his efforts to hide assets, and his generally difficult attitude, Mr.

26  Calvert has repeatedly told FBI agents and the United States Attorneys Office that Mr.

27  Berg's assistance proved valuable to his investigation.  When recently asked to assess the

28  value of Mr. Berg's assistance, Mr. Calvert stated that working with Mr. Berg allowed

1  him to move quickly to secure assets and helped the trustee's staff provide a "very good"

2  disclosure of the scope of the case to the investors early in the process.  Moreover, while

3  the government objected to Mr. Berg's proposal to receive compensation from the

4  trustees for his "cooperation," Mr. Calvert lobbied the government throughout the process

5  in support of the compensation agreement because he believed that Mr. Berg's

6  cooperation, even in light of his deceit and misdirection, was worth the $15,000.00 per

7  month that he wished to pay Mr. Berg.  Mr. Berg, however, wisely chose to refuse the

8  compensation from Mr. Calvert (although he continued to accept compensation from

9  Diana Carey, the Chapter 13 trustee for his personal estate, until he was arrested).

10  In the end, a forensic accounting reveals approximately $128 million in losses to

11  investors.  Agents and forensic analysts from the FBI, DFI and IRS-CID, are continuing

12  to conduct an extensive forensic accounting of Mr. Berg's empire.  They have collected

13  all available bank records for every account used or controlled by Mr. Berg between 2001

14  and November 2010, and entered every transaction into an Excel spreadsheet that they

15  have utilized to calculate the amounts of money Mr. Berg stole, how much he spent on

16  particular items, and how much money his victims have lost as a result of his fraud.  The

17  forensic accounting includes records for approximately 93 different bank accounts at 10

18  different banks and resulted in a database with over 124,000 rows of data. (*See* Nordyke

19  Declaration).  To date, the agents and analysts have completed a detailed accounting for

20  679 out of 844 investor-victims and are continuing to verify the final restitution and loss

21  amounts for the remaining 165 victims in preparation for the restitution hearing.

22  Using this database, as of February 1, 2012, the agents have documented at least

23  $244,833,410.86 in principal investment deposits (cash in) from investors between

24  January 2001 and July 2010.  During that same time period, Mr. Berg paid out

25  $121,442,944.68 to investors in the form of interest payments and redemptions.  This

26  leaves $123,390,466.18 in principal investments missing.  An additional $3,938,412.72 in

27  withdrawals cannot be categorized because the original items (checks, withdrawal slips,

28  wire transfer records, etc.) are unavailable.  Therefore, the distribution of those funds is

GOVERNMENT'S SENTENCING MEMORANDUM/ — 12
Frederick Darren Berg, CR10-310RAJ

1    unknown (i.e. the government does not know who received these funds).  Viewed in the

2    light most favorable to Mr. Berg, this could represent additional funds returned to

3    investors, resulting in an outstanding loss amount of $119,452,053.46.  However, an

4    additional $24.7 million in deposits into Mr. Berg's accounts also cannot be categorized

5    because the original items (checks, deposit slips, etc.) are unavailable.  Therefore, the

6    source of the funds is unknown (i.e. the government does not know who gave these funds

7    to Mr. Berg or his businesses).  This could very well represent additional investor funds

8    that were lost as a result of Mr. Berg's fraud.  The agents and analysts are continuing to

9    review records in this case in an effort to further clarify the exact amounts of loss and the

10   number of victims for purposes of the restitution hearing.

11        The overall loss calculation stated above, however, provides credit to Mr. Berg for

12   amounts that have been returned to individual investors beyond their original principal

13   investment.  Dozens of investors received all of their original principal investment back

14   plus interest over the course of the scheme, while the vast majority of investors received

15   only a portion of their original investment, or none at all.  Therefore, this overall loss

16   calculation fails to account for the total amount of loss to the victims who did not receive

17   their total investment principal.  As of February 1, 2012, the agents and analysts

18   conducting the forensic accounting have confirmed a total of $9,374,961.96 that was paid

19   to investors above and beyond their initial principal investment amount.  Therefore, the

20   total loss amount is at least $128,827,015.42.

21        **C.    Victim Impact and Restitution**

22        The agents have also separated out all investor transactions from the combined

23   database to create a separate database in order to aid their analysis of the total loss amount

24   and the amount of restitution owed to each particular investor.  They have been working

25   on these calculations since early December 2011, when they completed the first draft of

26   the combined database.  Many of the victims' restitution calculations were rather simple

27   to determine based on the first draft of the combined database.  Others, however, require

28   additional research to be sure that the agents have accurately recorded all of the investors'

GOVERNMENT'S SENTENCING MEMORANDUM/ — 13
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   deposits and withdrawals from Mr. Berg's various bank accounts.  In order to do so, they

2   must carefully review the database and conduct additional research using records seized

3   from Mr. Berg's businesses, records provided by the bankruptcy trustees, and relevant

4   bank records.  Because of the amount of time still necessary to conduct this additional

5   research, the government requested, and the Court has scheduled a separate restitution

6   hearing for April 6, 2012, at 11:00 a.m.

7       The victims who invested in Mr. Berg's series of mortgage investment funds

8   consist of people from a wide variety of backgrounds.  Some were sophisticated investors

9   who trusted Mr. Berg with millions of dollars, others were ordinary people seeking a safe

10  investment for their retirement.  Despite the fact that Mr. Berg's funds were marketed as

11  unregulated securities that were supposedly only available to sophisticated "accredited

12  investors" who met a high income and means test, Mr. Berg often ignored these

13  requirements and accepted investments from those who did not meet these qualifications.

14  Indeed, many of Mr. Berg's victims will be forced to make significant changes to their

15  lifestyle and that of their families such as foregoing retirement, taking additional jobs to

16  support their children's education and selling their homes.  Others are likely to be forced

17  into bankruptcy and may also lose their homes because of the financial devastation Mr.

18  Berg's fraud has caused.

19      The total number of victims in this case is well over 500.  Over one hundred sixty

20  of these victims have submitted detailed victim impact statements setting forth the

21  devastation that Mr. Berg's fraud has caused in their lives.  Those statements have all

22  been made available to the Court through U.S. Probation.  The victims, however, also

23  have a right to be heard "at any public proceeding in the district court involving release,

24  plea, **sentencing**, or any parole proceeding."  18 U.S.C. § 3771(a)(4).  In *United States v.*

25  *Burkholder*, 590 F.3d 1071 (9th Cir. 2010), the Ninth Circuit noted that the legislative

26  history of the 2004 Crime Victims' Rights Act suggests that Congress was concerned

27  with ensuring that crime victims be allowed to speak at proceedings and that this right not

28  be replaced with a written statement.  *See Burkholder*, 590 F.3d at 1075 (quoting 150

GOVERNMENT'S SENTENCING MEMORANDUM/ — 14
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Cong. Rec. S10910, S10911 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl).

## III. THE PLEA AGREEMENT AND THE SENTENCING GUIDELINES CALCULATIONS

### A. The Plea Agreement

Mr. Berg pleaded guilty to one count of Wire Fraud, one count of Money Laundering, and one count of Bankruptcy Fraud - Asset Concealment pursuant to a plea agreement entered under Federal Rules of Criminal Procedure Rule 11(c)(1)(C).  The plea agreement includes a statement of facts setting forth a summary of Mr. Berg's scheme to defraud his investors as well as his efforts to conceal assets from the bankruptcy trustee responsible for his personal estate following the collapse of his scheme.  As part of the agreement, the parties agreed to recommend a sentence of 216 months (18 years) imprisonment.  Should the Court reject this agreement, either party may withdraw from the plea agreement.  Should the Court impose the recommended sentence, Mr. Berg has waived his right to appeal or bring a collateral attack on the conviction except as it may relate to ineffective assistance of counsel.

### B. The Presentence Report and the Parties Offense Level Calculations

United States Probation prepared a final presentence report on January 12, 2012 with the following offense level calculations:

| | |
|---|---|
| Base Offense Level | 7 |
| Loss Amount ($100,000,000.00-$200,000,000.00) | 26 |
| 250 or More Victims | 6 |
| Misrepresentation in Bankruptcy Proceeding | 2 |
| Sophisticated Means | 2 |
| Money Laundering Conviction Under Section 1957 | 1 |
| Abuse of Position of Trust | 2 |
| Obstruction of Justice | 2 |
| Adjusted Offense Level | <u>48</u> |
| Acceptance of responsibility | -3 |

GOVERNMENT'S SENTENCING MEMORANDUM/ — 15
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    Total Offense Level                                    45

2    Because Mr. Berg's prior conviction for Bank Fraud in the District of Oregon is over ten

3    years old, U.S. Probation also determined that Mr. Berg was in criminal history category

4    I.  Based on an offense level of 45 and a criminal history category of I, Mr. Berg's

5    guideline range is life.  Based on the charges to which Mr. Berg pleaded guilty, his

6    maximum term of imprisonment cannot exceed thirty-five years.

7        **C.    Argument**

8            **i.        The loss amount is over $100,000,000.00**

9        The United States has documented an actual loss to investors of approximately

10   $128 million.  (*See* Nordyke Declaration).  This amount was calculated as follows based

11   on bank records for all of the accounts under Mr. Berg's control between January 2001,

12   and November 2010:

13           Amounts received from investors: $244,833,410.86

14           Amounts repaid to investors:     - $121,442,944.68

15           Overall Loss Amount:              $123,390,466.18

16   An additional $3,938,412.72 in withdrawals cannot be categorized because the original

17   items (checks, withdrawal slips, wire transfer records, etc.) are unavailable.  Therefore,

18   the distribution of those funds is unknown (i.e. the government does not know who

19   received these funds).  Viewed in the light most favorable to Mr. Berg, this could

20   represent additional funds returned to investors, resulting in an outstanding loss amount

21   of $119,452,053.46.

22       This overall loss calculation provides credit to Mr. Berg for amounts that may have

23   been returned to individual investors beyond their original principal investment.

24   Application Note 3(F)(iv), provides that "in a case involving a fraudulent investment

25   scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of

26   the property transferred to any individual investor in the scheme in excess of that

27   investor's principal investment (i.e., the gain to an individual investor in the scheme shall

28   not be used to offset the loss to another individual investor in the scheme)."  Therefore,

GOVERNMENT'S SENTENCING MEMORANDUM/ — 16
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    any amounts paid to individual investors beyond their original principal investment

2    amount must be added to the overall loss amount.  The forensic accounting to date has

3    revealed at least $9,374,961.96 that was paid to individual investors above and beyond

4    their initial principal investment amount (i.e. these individual investors are not entitled to

5    any restitution because they received their principal investment plus interest during the

6    course of the scheme and made a profit).  Adding this to the overall loss results in a total

7    loss of $128,827,015.42.[1]

8         Because the guidelines provide that "the court need only make a reasonable

9    estimate of the loss" these calculations are sufficient for purposes of the sentencing

10    guidelines calculations.  *See* USSG § 2B1.1 App. Note 3(C).

11         **a.    Credits Against Loss For Value of Collateral Pledged**

12         In his objections to the draft presentence report, Mr. Berg argues that he should

13    receive some form of credit against the loss amount for "market losses and investor

14    credits."  Although Mr. Berg may be entitled to a credit against loss pursuant to

15    Application Note 3(E)(ii) based on the fair market value of the loans and real estate

16    owned by the funds at the time of sentencing, or any amount already received by the

17    bankruptcy trustee for the sales of those assets, the plain language of the guidelines

18    establish a defendant is not entitled any credit for "market losses."   Application Note

19    3(E)(ii) provides that loss shall be reduced "in a case involving collateral pledged or

20    otherwise provided by the defendant, the amount the victim has recovered at the time of

21    sentencing from disposition of the collateral, or if the collateral has not been disposed of

22    by that time, **the fair market value of the collateral at the time of sentencing**."  *See*

23    USSG § 2B1.1 App. Note 3(E)(ii).

24         As of July 7, 2011, the bankruptcy trustee indicated that the Meridian Funds trust

25

26         [1]  This figure is subject to additional adjustment as the forensic accounting is completed.
The agents and analysts are continuing to confirm the final loss or gain figures for approximately

27    165 investors.  Of the $10,597,996.26 in gain currently documented, the agents have confirmed
$9,374,961.96 (i.e. these investors' records have been reviewed and compared with all other

28    evidence and their calculations have been verified).  (*See* Nordyke Declaration).

GOVERNMENT'S SENTENCING MEMORANDUM/ — 17
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   held loans with an estimated fair market value of approximately $9 million and real

2   estate with an estimated value of approximately $2.7 million that constitutes collateral

3   pledged or otherwise provided by the defendant. (*See* Attachment G at 6 - Trustee's First

4   and Final Application for Compensation and Reimbursement of Expenses at 6, *In Re:*

5   *Meridian Mortgage Investors Fund V, LLC, et al.*, Case No. 10-17952 (BKR W.D. Wa.)

6   and Attachment H - Meridian Investors Trust Fair Market Value as of July 7, 2011).  The

7   trustee also held approximately $1.5 million in cash recovered from the disposition of

8   collateral as of July 2011.  Therefore the legitimate credits against loss are calculated as

9   follows:

10          Outstanding Loss Amount:         $128,827,015.42

11          Money Returned                 -   $1,514,429.30

12          Loan Portfolio                 -   $9,000,000.00

13          Real Estate Owned (REO)        -   $5,000,000.00

14   Loss After Credits                     $113,312,586.12

15          Mr. Berg's argument that he should receive additional credit against the loss

16   amount because of the impact of market forces on the value of his loans and real estate is

17   specious.  Mr. Berg claims that the losses suffered in this case are largely the result of

18   market forces.  Yet, Mr. Berg was lying to his investors for years regarding those same

19   market forces, about how he would use his investors' money, about the quality of the

20   loans he was purchasing, and the basic financials of the funds such as how many loans the

21   funds actually purchased and held.  Indeed, as late as March 2009, just as his scheme is

22   beginning to collapse, Mr. Berg assured his investors in a video taped presentation that

23   the market had not damaged the investment funds.  Moreover, Mr. Berg has admitted to

24   engaging in elaborate efforts to deceive independent auditors hired to audit the financials

25   of some of his investment funds including fabricating false loan files and falsifying his

26   accounting records so auditors would not uncover his fraud.  Absent his lies about the

27   market and his use of the funds' money, the victim-investors who still had money

28   invested with Mr. Berg when the scheme unraveled in 2010, would not have placed their

GOVERNMENT'S SENTENCING MEMORANDUM/ — 18
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   money with him or kept it with him.  Market forces had nothing to do with the victims'

2   decisions to give their money to Mr. Berg or keep their money with Mr. Berg.  On the

3   contrary, Mr. Berg's false statements about the market, about the number of loans owned

4   by the funds, about the value of the loans owned by the funds, and about how he would

5   use his investors' money, was what fraudulently induced his many investors to place their

6   money with him and keep their money with him.  Under such circumstances it would be

7   absurd to reward Mr. Berg with a credit against the severity of his fraud based on the

8   same market forces he lied about.

9        **b.      Credits Against Loss For Property Returned to the Victims
               Before the Offense Was Detected.**

10

11       Mr. Berg also argues that he should receive a credit against the loss amounts for

12  funds recovered by the bankruptcy trustees through the sales of his bus company, his

13  house, and other personal assets that he had bought with the proceeds of his fraud.  As

14  Mr. Calvert has indicated in his pleadings submitted to the bankruptcy court, recoveries

15  from Mr. Berg's personal estate through the sales of his bus company, houses, and other

16  personal items, will bring approximately $5 million that will be distributed to the victims

17  as part of the bankruptcy proceedings.  (*See* Attachment H).  In addition, Mr. Calvert

18  estimates he may have a variety of civil causes of actions against third parties that may

19  result in additional recoveries for the victims.  (*Id*.)  While these amounts should be

20  credited against Mr. Berg's restitution order, he is not entitled to any additional credit

21  against the loss amount for purposes of the sentencing guidelines calculations.

22       Application note 3(E)(i) provides a defendant's loss amount shall be reduced by

23  the fair market value of property returned by the defendant before the offense was

24  detected.   Pursuant to Application Note 3(E)(i), the "time of detection of the offense is

25  the earlier of (I) the time the offense was discovered by a victim or government agency;

26  or (II) the time the defendant knew or reasonably should have known that the offense was

27  detected or about to be detected by a victim or government agency."  Mr. Berg did not

28  return any of the items recovered in the bankruptcy proceedings until long after his

GOVERNMENT'S SENTENCING MEMORANDUM/ — 19
Frederick Darren Berg, CR10-310RAJ

victims had discovered his offense and the FBI and Washington State Department of
Financial Institutions had already begun investigating his scheme.  None of these assets
were returned to the victim investors until after Mr. Berg was forced into involuntary
bankruptcy in June 2010.  As shown above, some of Mr. Berg's victims had started to
discover his fraud as early as January 2009.  Moreover, Mr. Berg admitted in his
interview with the government that he knew his fraud was unraveling throughout 2009
and 2010.  Mr. Berg surely knew throughout most of 2009 and 2010 that his fraud had
been uncovered or, at the very least, was about to be detected.  Yet, throughout 2009 and
2010, rather than do the right thing and stop his massive fraud scheme, Mr. Berg did the
exact opposite.  He redoubled his efforts to steal money and created five new investment
funds resulting in another $16 million in losses.  Although this is only a portion of Mr.
Berg's huge scheme, a $16 million Ponzi scheme in any other context is a huge fraud.  In
light of this evidence, Mr. Berg is not entitled to any credit for the items returned to
investors as part of the bankruptcy process.

### ii.    Obstruction of Justice

Mr. Berg argues that he should not receive an enhancement based on obstruction
of justice.  Although Mr. Berg's cooperation with the bankruptcy trustee was
unquestionably valuable and the government has agreed to recommend a sentence below
the guidelines largely as a result of that cooperation, Mr. Berg's behavior throughout the
process involved repeated obstruction of justice.  In addition to engaging in a pattern of
obstruction to hide assets from the bankruptcy trustee and obstruct the bankruptcy court
process, Mr. Berg also obstructed the criminal investigation.  During his interview with
the U.S. Attorney's Office and the case agents, Mr. Berg lied about his bank accounts.
Based on the nature of this case and Mr. Berg's obvious intelligence, he was well aware
of the importance of his bank accounts in terms of the criminal investigation.  Despite a
clear request for him to list what accounts he still controlled, Mr. Berg failed to disclose
an account into which he had deposited $145,000.00 just two days prior to his interview.

Mr. Berg also continued to attempt to obstruct justice even after his arrest.  As the

GOVERNMENT'S SENTENCING MEMORANDUM/ — 20
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   government noted at the detention hearing, Mr. Berg attempted to tamper with witnesses

2   on at least two occasions early in his detention at the Federal Detention Center.  In an

3   electronic mail message Mr. Berg sent to one of the bankruptcy trustees shortly after his

4   arrest, Mr. Berg attempted to manipulate the trustee into supporting his request for release

5   pending trial and even went so far as to offer a $150,000 payment to the bankruptcy estate

6   (money that in fact belonged to the bankruptcy estate) in exchange for the trustee's

7   support.  In addition, on November 3, 2010, in response to a witnesses request for advise

8   on how to handle an interview request from the investigating FBI agent, Mr. Berg

9   provided the witness with detailed instructions on how to delay the interview.  The Court

10  considered this evidence at Mr. Berg's detention review hearing on December 17, 2010,

11  and found "this type of conduct as being consistent with deception, and attempting to

12  interfere with the process by misleading with false information."  (*See* Dckt. 54 Verbatim

13  Reporting of Proceedings December 17, 2010, at 31).

14      Mr. Berg further claims that applying an obstruction enhancement amounts to

15  double counting because he has been separately charged with bankruptcy fraud.  Mr.

16  Berg, however, not only obstructed the bankruptcy court process - he also actively

17  obstructed the criminal investigation and attempted to tamper with witnesses in the

18  criminal investigation.  Therefore, the enhancement for obstruction of justice applies

19  separately for Mr. Berg's conduct in relation to the criminal investigation.  Because the

20  enhancement applies without reference to the bankruptcy fraud and misrepresentations

21  Mr. Berg made in regards to the bankruptcy case, it does not amount to double counting.

22      **iii.    Misrepresentations During Bankruptcy Proceedings**

23      Mr. Berg's objection to the application of an enhancement for making a

24  misrepresentation during a bankruptcy proceeding is equally without merit.  If this

25  enhancement did not apply in a case involving a conviction for bankruptcy fraud, it would

26  simply never apply.  Indeed, the Sentencing Commission noted that the amendment to the

27  guidelines that implemented the enhancement for making a misrepresentation or other

28  fraudulent action during the course of a bankruptcy proceeding was added specifically to

GOVERNMENT'S SENTENCING MEMORANDUM/ — 21
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    be applied in cases of bankruptcy fraud.  *See* USSG App. C. Amend. 597 ("Therefore,

2    any case involving a bankruptcy fraud will result in a two-level enhancement").  Although

3    Mr. Berg also argues that application of this enhancement would amount to double

4    counting because of the obstruction enhancement, the Application Notes to Section 2B1.1

5    provide that a bankruptcy misrepresentation enhancement is only inappropriate in

6    conjunction with an obstruction enhancement when "the conduct that forms the basis for

7    [the bankruptcy misrepresentation enhancement] is the **only** conduct that forms the basis

8    for an [obstruction enhancement]."  *See* USSG § 2B1.1 App. Note 7(E)(ii) (emphasis

9    added).  In this case, the conduct that forms the basis for the bankruptcy

10   misrepresentation enhancement is not the only conduct that supports the obstruction

11   enhancement.  Therefore, both should apply.

12                         **iv.    Abuse of Trust**

13           Mr. Berg further argues that he should not receive an enhancement for abuse of

14   trust.  He claims he possessed no special skills, training or licensing that would

15   characterize such a position of trust.  This is absurd.  Mr. Berg himself constantly

16   emphasized his special skills in the seller-financed real estate mortgage industry in

17   furtherance of his scheme.  He told his investors that his twenty years of experience in the

18   industry made him exceptionally qualified to handle their money.  Mr. Berg was an expert

19   in the seller-financed real estate loan market and used that expertise to deceive his victims

20   into believing he offered a safe and secure investment vehicle.  In recommending this

21   enhancement, U.S. Probation also notes that even after the financial and real estate

22   markets began to take a down turn, Mr. Berg met personally with many of his investors to

23   assure them their money was safe with statements based on his expertise in the industry

24   and claims that the market had not adversely impacted his funds.  Therefore, Mr. Berg's

25   offense involved a significant abuse of trust.

26           In addition, Mr. Berg admitted that he also managed a small number of trusts on

27   behalf of elderly clients.  Mr. Berg admitted that during the course of the scheme, he took

28   money from these individuals for whom he was acting as a trustee.  (Tr. 217-224).  As

GOVERNMENT'S SENTENCING MEMORANDUM/ — 22
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   with the other investors in his mortgage funds, the beneficiaries of the trusts Mr. Berg

2   managed relied upon his training and expertise in the financial markets to manage their

3   assets.  Even if Mr. Berg's larger scheme to defraud the investors in the mortgage funds is

4   not an abuse of trust (a dubious proposition), his out-and-out theft from trust accounts is a

5   text-book example of an abuse of trust.

6             **v.     Sophisticated Means**

7        Although Mr. Berg did not formally state an objection to the enhancement for

8   sophisticated means, his objection letter delivered to U.S. Probation does not include this

9   enhancement as part of the defense guideline calculations.  To the extent Mr. Berg

10  believes this enhancement is inappropriate, the government agrees with U.S. Probation

11  that in light of the extraordinary steps Mr. Berg took to conceal and perpetuate his scheme

12  through massive accounting fraud, deception of outside auditors and extremely

13  complicated banking transactions, an enhancement for sophisticated means is particularly

14  appropriate.  *See* USSG § 2B1.1 App. Note 8(B) ("sophisticated means" means especially

15  complex or especially intricate offense conduct pertaining to the execution or

16  concealment of an offense.").

17        **D.     Basis for Sentencing Recommendation**

18       The United States recommends the Court accept the parties agreed

19  recommendation of 18 years in prison followed by three years supervised release.  The

20  government recommends this substantial departure from the advisory sentencing

21  guideline range based on a number of factors including Mr. Berg's cooperation with the

22  bankruptcy trustees, his participation in an on-the-record comprehensive interview with

23  the government, the fact that he entered a guilty plea long before his scheduled trial date

24  unlike many defendants of his ilk, and the need to avoid unwarranted sentencing disparity

25  among similarly situated defendants.  Nonetheless, the government believes a long term

26  of imprisonment is necessary to reflect the seriousness of this offense and the need to

27  protect the public from a defendant who continues to demonstrate an unwillingness to

28  fully accept responsibility and will likely remain a risk to reoffend upon release.  An 18

GOVERNMENT'S SENTENCING MEMORANDUM/ — 23
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

year sentence is an attempt to balance the need to reward Mr. Berg's good decisions and encourage others to make similar (and hopefully more forthright) efforts to come forward, with the need to impose a term that will still protect the public, promote respect for the law and reflect the seriousness of his offense.

Mr. Berg's efforts to assist the bankruptcy trustees and his extraordinary on-the-record interview with the government deserve recognition in the form of a sentence below that recommended by the guidelines. While clouded by his repeated efforts to deceive and his apparent inability to fully accept the severity of his own conduct, Mr. Berg did provide a unique and substantial level of assistance to the bankruptcy trustees tasked with unraveling his fraud. Both trustees have indicated that his assistance was extremely helpful despite his attempts at obstruction. Overall, Mr. Berg's presence in their offices on a day-to-day basis early in the bankruptcy proceedings helped them develop an understanding of his businesses, the records they needed to review, the scope of the fraud and what they needed to do to stabilize the situation. Without that assistance, the trustees would have faced a very difficult task that would have resulted in more losses to the victim investors in this case.

A sentence of 18 years also serves to avoid unwarranted sentencing disparity among similarly situated defendants. The most similarly situated defendant recently prosecuted in this district was Kevin Lawrence. *United States v. Kevin Lawrence*, CR02-260MJP (W.D. Wa.). Mr. Lawrence, who was also represented by defense counsel Russell Aoki, defrauded a number of investors out of approximately $92 million. He was selling stock in a company, Znetix, that was purportedly going to develop high-end health clubs. Mr. Lawrence and others were indicted and Lawrence pleaded guilty shortly before trial. The parties in that case jointly agreed to recommend a 20 year sentence, which Judge Pechman followed. As part of the plea agreement, Mr. Lawrence agreed to provide full cooperation against his co-conspirators, but he ultimately did not provide any cooperation of substance.

While Mr. Berg's fraud involves approximately $20 million in additional losses,

1   Mr. Berg's level of assistance to the government and the bankruptcy trustees allowed this

2   case to be prosecuted in a much more timely and efficient manner than the Lawrence

3   case.  In addition, unlike Mr. Lawrence, Mr. Berg entered a guilty plea over two months

4   before the trial date (and likely at least six to twelve months before a trial could have

5   possibly begun) and saved the government and the trustees from engaging in a much more

6   costly investigation.  Moreover, Mr. Lawrence played a leadership role in a conspiracy

7   that involved him recruiting others to actively join his scheme.  Based on these significant

8   differences, the government believes Mr. Berg deserves a sentence slightly less than that

9   imposed in the Kevin Lawrence case.

10          A sentence of 18 years, however, is extremely important to reflect the seriousness

11   of the offense, promote respect for the law and provide just punishment.  Any further

12   departure below the agreed recommendation would severely undercut these goals.  Mr.

13   Berg's fraud is by far the largest Ponzi scheme ever prosecuted in the State of

14   Washington.  The restitution order that the government will seek on April 6, 2012, is

15   likely to involve over 500 victims and approximately $130 million in total restitution.  A

16   mere fraction of this amount was recovered as part of the bankruptcy process and,

17   therefore, these victims stand little chance of recovering the vast majority of the money

18   they entrusted to Mr. Berg.  Therefore, the government believes a sentence of 18 years is

19   necessary to and appropriate to satisfy all of the goals of sentencing set forth in Title 18,

20   United States Code, Section 3553(a).

21          DATED this 3rd day of February, 2012.

22          Respectfully submitted,

23          JENNY A. DURKAN
            United States Attorney

24

            *s/Norman M. Barbosa*
25          NORMAN M. BARBOSA
            Assistant United States Attorney
26          WA Bar #28188
            United States Attorney's Office
27          700 Stewart Street, Suite 5220
            Seattle, WA 98101-1271
28          Telephone: (206) 553-4937; Fax: (206) 553-2502

GOVERNMENT'S SENTENCING MEMORANDUM/ — 25
Frederick Darren Berg, CR10-310RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s).

s/Anna Chang
ANNA CHANG
Paralegal
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone:   (206) 553-2274
Facsimile:   (206) 553-2502
E-mail:  Anna.Chang@usdoj.gov

CERTIFICATE OF SERVICE