The Hon. Richard A. Jones

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CAUSE NO. CR10-0310 RAJ |
| ) | |
| Plaintiff, ) | DEFENDANT'S SENTENCING |
| ) | MEMORANDUM |
| v. ) | |
| ) | |
| FREDERICK DARREN BERG, ) | |
| ) | |
| Defendant. ) | |

## INTRODUCTION

The defendant, Frederick Darren Berg, by and through his counsel Michael C. Nance, Attorney at Law, and Russell M. Aoki of Aoki Law PLLC, respectfully requests this Court to accept the Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement which mandates a sentence of eighteen years.[1]

## GUIDELINE CALCULATIONS

The Court will find the plea agreement does not set out guideline calculations, particularly pertaining to loss amount. At best, the parties could only estimate a loss

---

[1] From the outset, Mr. Berg has actively participated in his defense, offering suggestions on legal strategy, financial accounting and the framing of argument. Due to a mail sorting mistake at the Federal Detention Center he did not have an opportunity to review this memorandum prior to its submission. The defense, therefore, asks leave to supplement this filing as appropriate.

DEFENDANT'S SENTENCING MEMORANDUM - 1

amount of approximately $100 million.  An exact amount cannot be determined due to the lack of records, insufficient information as to whether any figures are fully devoid of interest payments, and whether market loss is applicable.  Even after the entry of Mr. Berg's guilty plea, the Government spent months attempting to calculate an accurate loss figure and is still unable to present a loss amount that is precise and reliable.  In a recent letter to defense counsel, it conceded that over $23 million in deposits and $1.1 million in withdrawals could not be categorized because of missing records to document their source.

The applicable guideline for calculating a fraud loss amount requires that the court make a reasonable estimate of the loss.  USSG § 2B1.1. cmt. n.3.  "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense, meaning monetary harm that the defendant knew or, under the circumstances, should have known was a potential result of the offense. " *Id.* , Cmt. n.3(a)(i),(iv).  In calculating loss amount in Ponzi scheme-type activity, the court should make factual determination establishing the scope of the defendant's undertaking and the amount of losses reasonably foreseeable to him.  *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010).

Since his last court appearance, Mr. Berg has accessed the 124,000-row Excel spreadsheet recently compiled and used by the Government as a basis for its most updated calculations and determined that the loss amount is not as high as that portrayed by the Government and that his fraudulent Ponzi activity possibly did not occur until 2008.  However, unauthorized investments to Mr. Berg's motor coach businesses occurred earlier.  It was only around that time that Meridian first paid out in the aggregate more in principal and interest to investors than it had previously taken in.  Below is a graph

DEFENDANT'S SENTENCING MEMORANDUM - 2

prepared by Mr. Berg after his review of the Government's spreadsheet.  The purpose of this graph is to clarify the timing of the "Ponzi" activity.



This graph does not include the earlier unauthorized wire transfers, which Mr. Berg admits. *See*, Declaration of Russell M. Aoki (herein "Aoki Dec") and attachments therein.

Some investors were apparently paid interest payments before losing re-invested principal, and the amounts paid out are likely understated because of the dearth of available records.  Notably, the real estate market changes that began around the same time aggravated Mr. Berg's tenuous position and fueled further losses.  As referenced in defendant's objections to Probation's draft report, regardless of how much credit he is due from market losses, they were an undeniable factor in compounding and accelerating the losses his investors suffered.  Aoki Dec.  Although the actual loss amount is fairly debatable, it may well be significantly less than $100 million.

The Government will also seek to enhance Mr. Berg's guideline numbers for his purported abuse of trust (USSG §3B1.3), his sophisticated means (§2B1.1(b)(9)(C)), and

DEFENDANT'S SENTENCING MEMORANDUM - 3

his number of victims( §2B1.1(b)(2)).  These factors are closely correlated with each other and with the approximately $100 million loss amount and, if applied by this Court, would provide unnecessary independent weight.  See Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 170, 2008 WL 2201039 (Feb. 2008).  "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id.*

> The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide…   Any case involving a corporate officer and a multi-million dollar fraud will almost always trigger application of multi offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing - conducting a big fraud in a corporate setting.

*Id.* at 7.  *See also*, Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud,* 28 Cardozo L. Rev. 1611, 1648-49 (2007).  (Factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011) ("The loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double-counting' in some cases,"  while "the guidelines failed to take into account important mitigating offense and offender characteristics.")

The Commission has recognized this problem of "factor creep," in which more and more adjustments are added to the sentencing rules, making it difficult to insure their

DEFENDANT'S SENTENCING MEMORANDUM - 4

cumulative effect properly track offense seriousness.  *Fifteen Year Report at 137.*  Justice Breyer in 1999 warned that there is "little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finally among similar offenders.  And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recalled the Guidelines' largo rhythmic numerical scales)…. The precision is false."  *See*, *e.g.,* Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180, 199 WL 730985 at 11 (1999).

A guideline calculation for a wire fraud involving an approximate $100 million loss amount is unfairly enhanced with factors that routinely and inherently accompany a fraud of this magnitude:  sophisticated means (USSG §2B1.1(b)(9)(C)), abuse of trust (§3B1.3), and number of victims §2B1.1(b)(2)).  A large scale fraud of this type necessarily includes these factors, which are already captured in the loss amount for which Mr. Berg is accountable and which are not atypical of the heartland of wire fraud cases with this degree of loss.   For the Court to enhance Mr. Berg's total offense level with an additional *ten levels* for these factors would artificially inflate the guidelines to unrealistic proportions and overwhelm the more appropriate factors of 18 USC § 3553(a), factors which actually support the sentence the parties have negotiated.

## BASIS FOR ACCEPTANCE OF THE 11(c)(1)(C) PLEA AGREEMENT

### *Mr. Berg's Cooperation Provided the Government with a Greater Understanding of the Scope of his Conduct.*

Foregoing an immunity agreement, Mr. Berg participated in a four-hour meeting with the Government where he explained his business activities which eventually became the basis for this prosecution.  At the completion of his four-hour meeting, Mr. Berg remained

DEFENDANT'S SENTENCING MEMORANDUM - 5

prepared to meet with the Government in subsequent meetings to further elaborate in more detail the extent of his conduct.  Although no additional follow-up meetings took place, Mr. Berg's cooperation still proved to be of significance.

On October 13, 2010, the Government filed an Information, charging nine counts of wire fraud and one count of money laundering, based upon the statements of Mr. Berg and his first counsel, Mr. Irwin Schwartz .  The Government later learned that Mr. Berg was not truthful pertaining to funds he held in a separate account for which he has agreed to plead guilty and which are reflected in Count 12 (bankruptcy fraud - asset concealment).

A subsequent 34-page criminal complaint, based on references to Mr. Schwartz's detailed description of his criminal activity, was filed on October 19, 2010.  Additionally, Mr. Berg cooperated with the two bankruptcy trustees pertaining to his involuntary bankruptcy and his own personal bankruptcy.  The information he provided, when balanced against the information that became the basis for his bankruptcy fraud - asset concealment and money laundering charges, nevertheless made his cooperation helpful to the bankruptcy trustee's work and also expedited the Government's criminal investigation.

### *Meridian Mortgage Funds Began As A Lawful Business Entity.*

Mr. Berg ran a number of successful businesses including a motor coach company, real estate business, software enterprise, and a construction firm.  Meridian Mortgage Funds began as a lawful activity.  The foundation of its work was creating mortgage funds based upon seller financed residential notes.  From its inception, it became a popular investment vehicle.  However, when purchasers began failing to pay their obligations on the notes, investors became concerned and asked for redemption of their investments.

DEFENDANT'S SENTENCING MEMORANDUM - 6



720 OLIVE WAY, STE. 1525
SEATTLE, WA  98101-1816
T: 206.204.6742  /  F: 206.442.4396
www.aokilaw.com

The onslaught of a large number of requested redemptions ultimately caused Mr. Berg to seek investors to pay these remittances, which became a cornerstone of this prosecution.

Mr. Berg's business was *not* designed to be a fraud from the beginning.  Instead, it was a legitimate business that, due to dramatic adverse changes in the market, prompted him to act out of desperation in hopes of keeping his businesses alive and his investors satisfied until the downward trend of the economy reversed.  However, no one – certainly not Mr. Berg – anticipated the magnitude and duration of the economic recession that hit this area and that crippled his business.  Mr. Berg's creation of a legitimate business is noted in Probation's own pre-sentence report and noted by bankruptcy trustee Mark Calvert to Mr. Berg's defense counsel.

### ***Mr. Berg's Plea Avoided A Costly Trial.***

This case involves millions of pages of documents and hundreds of victims. Preparing for trial would have required an enormous expenditure of time and expense to properly investigate and examine the relevant documents, prepare for the testimony of government witnesses, and obtain the forensic accounting services necessary to mount an adequate defense.  However, Mr. Berg made clear from the beginning that he did not wish to contest the charges and that he wanted to resolve this case and take full responsibility for his actions.  His only concern was that the negotiated plea be one that was reasonably proportionate to the crime he committed.  As this Court is aware, the Government and Mr. Berg, through his defense counsel, participated in two settlement conferences.  After careful evaluation of all the factors available at that time in determining the most reasonable resolution by both parties, Mr. Berg accepted this plea agreement on August 2, 2011.

DEFENDANT'S SENTENCING MEMORANDUM - 7



### *Mr. Berg's Background Provides A Basis For Better Understanding The Appropriateness Of The Proposed Sentence.*

Mr. Berg was born in Ashland, Oregon.  As described by Probation, Mr. Berg's father passed away in 1987 from cirrhosis of the liver.

> He was in his mid-50's.  The defendant described his father as "a tortured man."  He explained that he supported the family working as a butcher and drank excessively.  When his father was sober, he was "the funniest guy around;" however, when intoxicated he was "very mean and abusive."  The defendant's mother recalled those early years as "very chaotic and emotionally depressing."  She noted that she stayed married to the defendant's father for twenty-three years "mostly out of fear."  Despite this, the defendant was described as outgoing and industrious.  He explained that, at the age of nine, he began selling cherries in his grandfather's front yard.  He added, "I didn't just sell cherries, I had a complete business plan worked out."

Pre-sentence Report, p. 9, ¶ 47.

Mr. Berg's sister, Wendi Sigel, better describes her brother's upbringing in her letter of support.

> Darren is one of the cleverest and funny people I have ever known.  He has a mind that grasps concepts quicker than most, often leaving him with competing ideas warring for space in his brain.  He could have been extremely accomplished at many things, but his brain has never let him concentrate on any one area.  He is driven by the need to make the multiple concepts in his head realities.  He longs for acceptance and friendship and feels that no one would ever give that to him freely.  He was raised in a family where nothing about him was accepted.  My father considered him a sissy and my stepfather was homophobic and barely tolerated Darren's presence in his house.  Although Darren had not admitted to being gay in high school my stepfather treated him like he was contagious, and did not hide the fact that he couldn't wait until he graduated and moved on.  My other brothers, Shane and Rory, took a lot of their anger out on Darren.  My father would beat them and in turn they would beat Darren.  He was close to my mother and I because we were the only people in the family who loved him for who he was, which was a talented, emotional boy yearning for a place where people would like him.  He left Grants Pass with the need to prove that he was worth the space he was taking up in this world.
>
> Darren created an alternate world for himself early in his life.  The emotional and physical abuse that was happening in our household was simply too much

DEFENDANT'S SENTENCING MEMORANDUM - 8

> for him to handle.  When he was three I remember observing him curled up in bed as chairs were flying, everyone was screaming, my father was beating my mother and the police were coming with sirens blaring.  I thought at that time that I would love to be able to shut out all of the unbelievable things that were happening.  I truly feared for my life and Darren was curled up in bed asleep.  I know now that this was the beginning of his mind shutting down.  The world we inhabited was too scary for him to navigate, so he went somewhere he could be safe.  When he was eight he created an alter ego named Rod Taylor.  He set up a desk, ordered a sign and "went into business".  Due to his limited knowledge of the world he chose to run a bus company because our paternal grandfather was a Greyhound bus driver who often talked about the bus business.  Rod Taylor was successful, admired and smart, everything Darren did not believe he was.  He spent hours in his "play" world and we considered him odd but endearingly cute.  If Darren had one true belief in childhood it was that Rod Taylor was invincible.  Rod would never fail, Rod was the smartest, the best and always knew what to do.  He was admired and people craved his attention and friendship.
>
> Of course many of us had imaginary friends in our childhoods to help us through real or imagined traumas.  As we mature and enter the "real" world we know that people will consider us odd if we bring our "friends" along.  I honestly think that when Darren was forced to part with the fictional Rod Taylor it was simply not possible for him.  He was an adolescent who had few friends, was reviled at home and too scared to navigate the real world.  So when forced to choose between Darren Muskopf (Berg) with all of his shortcomings and problems, or Rod Taylor who was admired and successful, he gave up Darren.  Inside Darren was gone and Rod became real.

Aoki Dec.

In addition, Mr. Berg's mother further explains the tortured life of Mr. Berg when he was growing up.

> Darren was always a delight as a child, very obedient and loving despite, or maybe because of, his being a part of a very dysfunctional family in his early years. Until Darren was a young teenager our life was one of abuse of us all, at the hands of his father who was an alcoholic. The youngest of four children, Darren seldom experienced physical abuse but was considered by his father to be a sissy and suffered much mental abuse. I learned later in years that not only was he subject to his father's abuse but his older brother took over when we were not around and would give his younger brothers 'whops' when they displeased him. They were sworn to secrecy and this only came to light after they were grown and their older brother shared his very destructive behavior, which he was ashamed of. He had learned by examples set by his father. My

DEFENDANT'S SENTENCING MEMORANDUM - 9

> second oldest, a daughter, would have none of it and stood up to the older brother and was spared his abuse. Both older brothers teased Darren as being a sissy just as they saw their father do, I would also learn later. His sister was his only sibling always kind to him and they are extremely close to this day.
>
> I had married very young and didn't have the strength, the means or the fortitude to get out of the relationship until Darren was 13 years of age. Fearing his father's threats to kill us, and all my family members if we left, I stayed and received many beatings in protecting my children from his abuse. Indeed, after I filed for divorce, he came to my place of work and dragged me out threatening to kill us both with a shotgun he had in his car. Saved by one of the doctors in the clinic where I worked I would never know if he may have carried through with his threat.

Aoki Dec.

No one gets to choose how they will be raised.  Some are fortunate enough to grow up in nurturing and stable families.  Others are impacted by damaging traumatic experiences, which cause issues that must be resolved later in life.  Mr. Berg, his mother, and his sister have spent much time reflecting on their past family life and the need to resolve life-long issues.  Mr. Berg's mother and sister will continue to offer unconditional support of Mr. Berg throughout his sentence.

**CONCLUSION**

Frederick Darren Berg, by and through his counsel, respectfully requests this Court to accept the 11(c)(1)(C) stipulated plea agreement and impose a sentence of eighteen years.  He also requests that this Court make a judicial recommendation for his placement at FCI Terminal Island, that it recommend the BOP waive any public safety factor criteria that would otherwise prevent his timely placement into minimum security camp, and that

///

///

///

DEFENDANT'S SENTENCING MEMORANDUM - 10

his supervised release conditions not bar his self-employment.

DATED this 3rd day of February, 2012.

AOKI LAW PLLC

s/ *Michael C. Nance*
Michael C. Nance, WSBA # 13933
Attorney for Defendant
615 2nd Ave., Ste. 760
Seattle, WA  98104-2200
Phone: (206) 624-3211
Fax: (206) 587-0226
minance@aol.com

s/ *Russell M. Aoki*
Russell M. Aoki, WSBA # 15717
Attorney for Defendant
720 Olive Way, Suite 1525
Seattle, WA 98101
Phone: (206) 624-1900
Fax: (206) 442-4396
russ@aokilaw.com

DEFENDANT'S SENTENCING MEMORANDUM - 11



720 OLIVE WAY, STE. 1525
SEATTLE, WA  98101-1816
T: 206.204.6742 / F: 206.442.4396
www.aokilaw.com