Judge Richard Jones

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CAUSE NO. CR10-0310 RAJ |
| | ) | |
| Plaintiff, | ) | DECLARATION OF RUSSELL M. |
| | ) | AOKI IN SUPPORT OF |
| v. | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| FREDERICK DARREN BERG, | ) | |
| | ) | |
| Defendant. | ) | |

I, RUSSELL M. AOKI, hereby declare and state as follows:

1.     I am the attorney of record representing Frederick Darren Berg in the above-captioned matter along with co-counsel Michael C. Nance.   I make the following statements based upon my personal knowledge, information and belief.

2.     Attached are true and correct copies of letters of support from Mr. Berg's sister, Wendi Sigel, and his mother, Marlene Bamford.

3.     In addition Mr. Berg has examined the Government's 124,000 row Excel spreadsheet pertaining to its calculation of loss amount and restitution.  As the Court is aware, Mr. Berg was provided access to a stand-alone computer at the Federal Detention Center in SeaTac from January 13, 2012 to February 1, 2012.  Based upon the examination of the Government's own spreadsheet, Mr. Berg calculated the approximate

DECLARATION OF RUSSELL M. AOKI IN SUPPORT OF
DEFENDANT'S SENTENCING MEMORANDUM - 1

AOKILAW PLLC
720 OLIVE WAY, STE. 1525
SEATTLE, WA  98101-1816
T: 206.204.6742 / F: 206.442.4396
www.aokilaw.com

1  dates from which the "Ponzi" activities took place.  Attached is a true and correct copy of

2  the graph prepared by Mr. Berg along with his narrative.

3      4.    Attached is a true and correct copy of the Presentence Report Objections

4  submitted by co-counsel Michael Nance on December 7, 2011.

5      I declare under penalty of perjury under the laws of the United States that the

6  foregoing is true and correct.

7      DATED this _____ day of February 2012, at Seattle, Washington.

8

9

10                          Russell M. Aoki

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DECLARATION OF RUSSELL M. AOKI IN SUPPORT OF
DEFENDANT'S SENTENCING MEMORANDUM - 2**

October 16, 2011

The Honorable Richard A. Jones

Dear Judge Jones:

My name is Wendy Sigel and I am the sister of Darren Berg. It is hard for me to write this letter because I feel as if anything I say will be misconstrued as an attempt to excuse my brother's behavior. I do not in anyway want to do that, but I would like to tell you about another side of my brother.

Darren is one of the cleverest and funny people I have ever known. He has a mind that grasps concepts quicker than most, often leaving him with competing ideas warring for space in his brain. He could have been extremely accomplished at many things, but his brain has never let him concentrate on any one area. He is driven by the need to make the multiple concepts in his head realities. He longs for acceptance and friendship and feels that no one would ever give that to him freely. He was raised in a family where nothing about him was accepted. My father considered him a sissy and my stepfather was homophobic and barely tolerated Darren's presence in his house. Although Darren had not admitted to being gay in high school my stepfather treated him like he was contagious, and did not hide the fact that he couldn't wait until he graduated and moved on. My other brothers, Shane and Rory, took a lot of their anger out on Darren. My father would beat them and in turn they would beat Darren. He was close to my mother and I because we were the only people in the family who loved him for who he was, which was a talented, emotional boy yearning for a place where people would like him. He left Grants Pass with the need to prove that he was worth the space he was taking up in this world.

Darren created an alternate world for himself early in his life. The emotional and physical abuse that was happening in our household was simply too much for him to handle. When he was three I remember observing him curled up in bed as chairs were flying, everyone was screaming, my father was beating my mother and the police were coming with sirens blaring. I thought at that time that I would love to be able to shut out all of the unbelievable things that were happening. I truly feared for my life and Darren was curled up in bed asleep. I know now that this was the beginning of his mind shutting down. The world we inhabited was too scary for him to navigate, so he went somewhere he could be safe. When he was eight he created an alter ego named Rod Taylor. He set up a desk, ordered a sign and "went into business". Due to his limited knowledge of the world he chose to run a bus company because our paternal grandfather was a Greyhound bus driver who often talked about the bus business. Rod Taylor was successful, admired and smart, everything Darren did not believe he was. He spent hours in his "play" world and we considered him odd but endearingly cute. If Darren had one true belief in childhood it was that Rod Taylor was invincible. Rod would never fail, Rod was the smartest, the best and always knew what to do. He was admired and people craved his attention and friendship.

Of course many of us had imaginary friends in our childhoods to help us through real or imagined traumas. As we mature and enter the "real" world we know that people will consider us odd if we bring our "friends" along. I honestly think that when Darren was forced to part with the fictional Rod Taylor it was simply not possible for him. He was an adolescent who had few friends, was reviled at home and too scared to navigate the real world. So when forced to choose between Darren Muskopf (Berg) with all of his shortcomings and problems, or Rod Taylor who was admired and successful, he gave up Darren. Inside Darren was gone and Rod became real.

When Darren left home and went to college he had a whole new confidence. He left behind a town where he was not accepted and entered a world where no one knew him or judged him. Most who know him after high school will describe him as a personable, knowledgeable person who exuded confidence in his business talents. Darren was 18 years old, but Rod had been running a successful (imaginary) business for years. People believed in his visions and (though I did not know it until recently) the bus company became real. Of course in reality "Darren" knew nothing about running a business. It was doomed for failure.

Darren was not around our family much for a long time. He had embraced his sexuality but was not comfortable sharing his gay lifestyle with us. He did not even tell us he was gay until he was in his 30's, although we had suspected it long before that time. I am not aware of a lot of the details of Darren's life during this period. Evidently there was another attempt to run a bus company in Portland and some legal problems. I cannot comment on them because I was pretty isolated from Darren's life at this point. He was always home for Christmas during this time though. He doted on my children, and they worshipped him. They loved his sense of humor and creativity. If we were going to have a cookie decorating contest you could always count on Uncle Darren to come up with something that would be unusual and creative. He taught them to ski and relished the unconditional love that they gave him. They became his surrogate children and he was as devoted to them as they were to him. Uncle Darren coming to town, or joining us on vacation, was a relished treat for my kids. He was the superstar in their lives, and it was never because of money or physical possessions. One of their fondest memories is at Disneyworld when Darren bought two NASA stickers to place on our white rental van and we spent the week driving around in our "official NASA van". It was great fun with lots of laughs, game playing and companionship. My family's relationship with Darren has never been about money.

I am not sure how Darren got into the investment business. That is a story I have never been told. It is my belief that Meridian Partnerships was a completely legitimate business. Somehow Darren's sales talents and the investment market combined and he strived to establish relationships with his investors that he cherished. He was buying and selling property and using his sharp instincts to run a successful company. I truly believe this. I think records of the company would clearly support the fact that funds were being handled in a legitimate manner during this time.

I remember very clearly the day that he called me about a bus company. It was early in 2003 and a liquidator who had buses in Portland Oregon that needed to be liquidated had contacted him. 911 had caused a steep decline in the tourist industry and buses were going for cents on the dollar. I told him that his life was going well and not to get involved in a

bus company. As the business manager for our family car dealership I realized the additional manpower it would take to run a bus company versus an investment firm. I thought it would be a losing proposition. But in late 2003/2004 MTR became a reality and "Rod Taylor" was back in business. At some point Darren allegedly transferred funds illegally to this business and a downward spiral started that took him to where he is today.

Legally there is probably no difference in a boy caught in his imaginary world of "Rod Taylor" and a shyster bilking investors out of their money. The end result is a loss of investor trust and money. But those who have portrayed Darren as an evil genius wanting to live the high life by creating a ponzi scheme to bilk investors out of their money are way off the mark. Instead he is a grown man who is really a young boy wanting to run a successful bus company. His lack of business experience led him to believe that he could buy buses at pennies on the dollar and make a ton of money in the transportation business. He expected and believed that he would pay all of his investors back every cent they invested, with interest. He was naïve and he was wrong to invest in assets that were not approved in the investment agreements.

Darren's time in detention has forced him to face his demons square on. He realizes at this point that he has emotional problems, which need to be addressed. I know that there will be an attempt to show that there is a pattern to his adult life that shows he wants to con people out of their money. I would submit that the pattern shows more clearly that he has a need to run a successful bus company and has periods in his life where his imaginary world overwhelms his real life. Loss of money has always come coupled with the attempt to run a bus company. He is in need of mental health counseling so that he can separate these two worlds and recognize fantasy from reality.

I love my brother and pray that you will consider the circumstances that created the man we now call F. Darren Berg. It has been a complicated journey.

Sincerely,

Wendy Sigel
1126 NW Morgan Lane
Grants Pass, Oregon  97526
541-474-2026
wsigel@charter.net

September 6, 2011

Re: F. Darren Berg

Dear Judge Jones:

My son, Frederick Darren Berg, will be coming before you shortly to receive the sentencing for his crimes against society. While you see the picture the prosecution will be presenting I would like you to weigh the kind of a son Darren has been so as to get a better feel for the person behind the crime.

Darren was always a delight as a child, very obedient and loving despite, or maybe because of, his being a part of a very dysfunctional family in his early years. Until Darren was a young teenager our life was one of abuse of us all, at the hands of his father who was an alcoholic. The youngest of four children, Darren seldom experienced physical abuse but was considered by his father to be a sissy and suffered much mental abuse. I learned later in years that not only was he subject to his father's abuse but his older brother took over when we were not around and would give his younger brothers 'whops' when they displeased him. They were sworn to secrecy and this only came to light after they were grown and their older brother shared his very destructive behavior, which he was ashamed of. He had learned by examples set by his father. My second oldest, a daughter, would have none of it and stood up to the older brother and was spared his abuse. Both older brothers teased Darren as being a sissy just as they saw their father do, I would also learn later. His sister was his only sibling always kind to him and they are extremely close to this day.

I had married very young and didn't have the strength, the means or the fortitude to get out of the relationship until Darren was 13 years of age. Fearing his father's threats to kill us, and all my family members if we left, I stayed and received many beatings in protecting my children from his abuse. Indeed, after I filed for divorce, he came to my place of work and dragged me out threatening to kill us both with a shotgun he had in his car. Saved by one of the doctors in the clinic where I worked I would never know if he may have carried through with his threat.

As a divorced woman, with no work experience and two young sons to raise after my daughter had left for college and my oldest son had married, I had been lucky to land a job in a medical clinic where my daughter had worked after school during her high school years to save for her college tuition, knowing her father would be of no help. We were living hand to mouth for about a year when I married an old friend who had recently divorced and had custody of his two young girls, approximately the same ages as my boys. While my second husband was far from the demon Darren's father had been he had

1

his own faults, as do we all. Coming from Germany when he was five years old he was very strict and believed you should expect much from boys, while girls were allowed to skate through life. He was an excellent influence on the boys in terms of work ethic but always told them the only way to succeed in life was to be the boss. Working to make someone else comfortable was servitude. We remained married until Darren was a sophomore in college.

Darren was always a good student with very good grades. We never had to worry about drugs or alcohol in his teenage years. I can honestly say he was an ideal teenager. Responsible, smart, and very active in school (he went to Washington DC for Mock Political Convention and also Mock United Nations and met personally with Oregon's Governor Atiyeh during his high school years), with many friends and great teachers who thought he would go far. Always wanting to go to college he worked toward saving for his education. While our family was certainly not poor our expenses for our large family of six and the running of the ranch on my husbands cattle buying business left no room for extra expenses and my husband believed you should work your way through college anyway. With Darren's heavy class load (he tried to get it all done too quickly) he finally had to drop out in his sophomore year and go to work.

Instead of coming back home he went to San Francisco to drive motor coaches (a real passion of his-later to lead to his downfall). Never understanding why a country boy raised all his life in Southern Oregon would want to pursue a life in the big city I came later to understand this move also. Southern Oregon is known for it's 'good ole boy', 'red necked' Republican views (in direct opposition to Northern Liberal Oregon-thus the "State of Jefferson" movement that would have incorporated Southern Oregon and Northern California to represent the conservative population). What I didn't know at the time, and what Darren was reluctant to tell me, was that he was gay. Fearing rejection, especially from his beloved grandmother who was a Mormon, older brother who had become quite religious in his later years, his very macho step-father (who he looked up to and had gone to court on his own to have his name change from the shame of his biological fathers to his stepfathers) and all of his high school friends, we saw very little of Darren in the next 20 years while he kept his lifestyle secret. Darren only came out to me in 1995 after my divorce from his stepfather and the death of his grandmother. He was very relieved that my love for him had not changed and that the love of his dying older brother was still there despite the beliefs of the sins of his lifestyle.

I am sure you hear many tales of dysfunctional families, as they seem to be more the norm today than the exception. I just want you to know the trials and tribulations Darren has had to face in his lifetime. He has had many and I am not blameless in letting them occur. I guess we make our peace by knowing that we did what we could with what we knew at the time and, I'm ashamed to say, it took me a long time to discover what really should have been done to protect my children.

Darren has a heart of gold, and while he sometimes allows people to take advantage of him to the point of blowing up at them, he is a very gentle, loving soul. He has tried to make my life easier in my old age and has always been a very respectful and loving son. He has an enormous soft spot for animals and it breaks my heart that the Golden Retriever he raised as a pup and has always been at his side, work or play, will now die without ever knowing him again, nor he her. She is now in my care and is 13 years old.

While the prosecution sees this as a great ponzi scheme, I see it as a long time legitimate business that later took a wrong road to try to achieve his dream. I truly believe he was confident the luxury bus company that had been his lifetime dream would be a huge success and all the monies he was 'borrowing' illegally would be paid back in spades. We will never know if he would have been able to pull it off if the economy hadn't tanked. I do know his desperation in the end came from not only trying to save face for himself, but to keep his many employees and drivers and their families employed.

As you hold the future of my son's life in your hands I understand the disdain you may feel for his actions. I, too, hate the crime, but I love the criminal. I know Darren's heart and redeemable qualities, where you have only to judge him by the wrongs he has done. I understand there has to be a price to pay for his breech of trust with his investors but I hope only the facts will weigh in your decision on a final sentence and not the notoriety or anger of these investors. They too must be culpable for a small percentage of the guilt, as savvy investors, for letting their greed overtake their reason. Also, had they been invested in stocks or real estate their investments would have taken a 33% +/- loss.

One of the problems with the so called facts of this case is that my son has not been able to disprove a lot of things he has unjustly been accused of because of his limited access to the books to figure an accurate loss and victim count. The defense, for all practical purposes, has had their hands tied behind their backs. Therefore he will stand before you, for judgment on his future, with accusations based on guesses, estimates and information obtained by illegal means by the person that was entrusted to represent him in the handling of his bankruptcy. A very unsavory and dishonest person in his own right.

In the end, how much time does it take for someone to learn a lesson? What is the benefit of incarcerating a young man for so many years his likelihood of ever repaying the restitution to his victims becomes highly improbable? In a country of second chances why is it beyond the realm of sensibility to assess a meaningful amount of time, with all social privileges taken away, as payment for the crime itself and then allow that person to be able to reenter society and repay his debt? If I know my son, and I do, if you let him out tomorrow I would stake my life he would not be before another court of law in his remaining lifetime. He has seen the wages of his crime during his recent incarceration and, I know, will never put himself in that position again. White collar crime is not a

victimless crime, but neither is it a deadly one. Monies are made and lost all through life. I, too, have made some costly mistakes that cost me dearly in my retirement and there is no restitution for me to draw from. I made some bad decisions and I am paying for them in my old age and now have just my Social Security to sustain me in my remaining years. This, in no way, is to excuse the wrongs done by my son to his investors, but rather to put it all in perspective.

You helped facilitate a second settlement conference that resulted in a plea agreement and sentence that was thoroughly vetted among many other cases of like offenses and, by comparison, is really more than like cases in time vs. damages. Therefore, I hope you will accept these conditions. Further, I respectfully ask that you honor the defendant's request for placement at Terminal Island, California. This choice was very heavily analyzed by the entire family and, because of the ability to keep in personal contact with my son, was the most economical and convenient for his family members. My mother was one of 13 children and was raised in Ventura, California, and I lived in Los Angeles County for the first 13 years of my life, so I have many cousins and school friends in the area. One of my cousins lives right in Long Beach. With our remote location (flying out of Medford, Oregon) the flights to the Los Angeles area are the most reasonable airfare and the most direct flights. That, coupled with the extended family and friends in the Los Angeles area and my age of 75 years, would enable us to see him on a more regular basis with the least discomfort and cost.  Placing him in another facility would punish no one but his immediate and extended family and the friends he has left.

Respectfully submitted for your consideration,

*Marlene Bamford*

Marlene Bamford

# SOURCES OF FUNDS TO REPAY INVESTORS
## Graphical Interpretation of Competing Versions



**Principal & Interest Collected vs. Paid Out**
*(Cumulative Surplus or Deficit)*

*Per the corrected version, Meridian became a Ponzi scheme in 2008*

*Per the government's version, Meridian became a Ponzi scheme in 2002 or 2003*

**READING AND UNDERSTANDING THE GRAPH:**

1.  The blue line is the government's version.  The red line is the corrected version.

2.  Amounts shown above the horizontal black line indicate that interest and principal payments paid to investors were covered by investment income (i.e. interest and principal payments received from borrowers).  Amounts below that line indicate that funds raised from later investors were used to pay principal and interest payments to earlier investors. **The numbers shown here are cumulative** - in other words, this is a "running total" year to year of where Meridian stood on collections vs. disbursements.  The difference between the two versions is essentially the  $25 million in income that is miscoded on the Government's spreadsheet.

3.  Upon reviewing the graph, it becomes plainly evident that **the proper coding and allocation of this $25 million in income is critical to determining the true version of events at Meridian.**  Simply leaving this income unallocated, as the government does, cannot be considered a reasonable estimate given it results in Meridian becoming a Ponzi scheme in 2002 or 2003 while allocating the income moves the date out to 2008.  The difference between these two versions is not insignificant.

December 7, 2011

Mr. Steven McNickle
U.S. Probation Officer
700 Stewart Street
Seattle, Washington 98101

   Re: *United States v. Frederick Darren Berg*
    No. CR10-310 RAJ

Dear Mr. McNickle,

   We have received and reviewed your presentence report with Darren Berg.  We have the following comments and objections:

   cover page:  Mr. Berg's sentencing has been continued to January 20, 2012.

   The offense conduct.  Mr. Berg admits and acknowledges the gravamen of the offenses to which he pled guilty and most of the conduct contained in your narrative of the offense conduct, but he objects to several matters as either inaccurate or unsupported by the facts and circumstances of his case.  He wants to be sentenced for the crimes he committed and for what he did and to have the record accurately reflect his conduct.  He remains deeply concerned about the government's apparent continued insistence that the investment funds in question were purely fraudulent Ponzi schemes from their inceptions.
   To date, the government has produced only the most cursory support for any particular loss amount and none that document a Ponzi scheme early in the life of these investment funds.  Mr. Berg insists that these funds began as a legitimate, profitable business that only much later crossed the line into fraud and believes that a thorough forensic analysis of this financial records, with due allowance for market losses and investor credits, would likely result in a significantly lower amount.  Unless the stipulated facts of the plea agreement (with its approximate $100 million loss figure) are accepted as the final word on the subject, the point in time at which the funds became fraudulent is critical to establishing the loss amount and to identifying and counting the victims.

   The defense effort to fairly portray Mr. Berg's conduct has been hampered by his inability to properly access the massive financial data through appropriate software.  Even if these financial records were available to Mr. Berg, a proper analysis would require

Letter to USPO Steven McNickle - page 2

hundreds of hours, and even then no exact calculations could ever be reliably determined. Again, the basis of any guideline calculations should derive from the stipulated Statement of Facts in the Plea Agreement.  Any other basis is inherently flawed and prone to mislead the court as to the extent of Mr. Berg's crimes.

Working with available – but incomplete and under-analyzed – information, we raise the following points:

Paragraph 7:  The true number of investors is questionable, since the counting method has not been clarified and is tied to the loss amount, itself not precisely determined.  Some investors were likely double-counted, which results in an exaggeration of the number.  In any event, not all investors in the funds were victims, as some actually made a net profit on their investments.  Others incurred losses precipitated by market forces beyond anyone's control.  Only those investors who made a positive dollar contribution to losses deemed attributable to Mr. Berg's fraud qualify as victims for sentencing purposes.  See *United States v. Armstead*, 552 F.3d 769, 780-781 (9th Cir. 2008).  To save the government time and resources determining an exact victim count, Mr. Berg stipulated to raising over $280 million from "approximately 500 investors".  A fair inference is that over 250 investors, the threshold necessary for application of the highest guideline enhancement on this factor, were victimized.

Paragraph 9:  From available records, we do not know the basis for determining the amount of money raised from investors in CS Note Holdco and, therefore, dispute the stated amount.

Paragraphs 11 – 13:  At some point, investment money intended for real estate investment was instead diverted for other purposes not authorized by or known to the investors:  to Mr. Berg's private tour bus companies[1] or to his own personal accounts for non-investment purposes.  In 2009 the investment funds reached a crisis point following severe adverse turns in the real estate market and the call by several investors for redemptions which Mr. Berg was unable to honor because the funds were insolvent. Among his other concerns at the time, he wanted to protect the value of his remaining assets, maximize their value, and make investors as whole as possible.

---

[1]Mr. Berg's tour bus companies included Meridian Transportation Resources (Canada), Ltd., Meridian Transportation Resources (California), LLC, Meridian Transportation Resources, LLC, and Oregon Coachways, Inc.  All of these entities eventually became part of Mr. Berg's personal bankruptcy estate.

Letter to USPO Steven McNickle - page 3

After the Meridian funds were forced into bankruptcy but prior to government investigators becoming aware of problems with the funds, Mr. Berg engaged a criminal defense attorney, Irwin Schwartz, to approach the government with an offer to reveal his actions and assist the bankruptcy trustee and the government in untangling his complex business arrangements. Thereafter, on several occasions, Mr. Berg met with government prosecutors and investigators, and repeatedly met with and assisted bankruptcy trustees Mark Calvert (for the investment funds) and Diana Carey (his personal bankruptcy trustee). For many weeks, Mr. Berg was in daily – even hourly – contact with Mr. Calvert in an effort to provide assistance and cooperation.

Mr. Berg was also cooperative with prosecutors. After being stymied at his attempt to keep his retained attorney, Mr. Berg and his newly appointed counsel, in a virtually unprecedented overture, submitted to a four-hour proffer session with the government *without* standard proffer protection, a session in which he largely admitted his role in committing fraud with the investment funds. But afterwards – and even after the government filed a charging information on October 13, 2010, up until his arrest on October 20 – Mr. Berg continued to offer assistance and advice to the bankruptcy trustees.

Paragraph 17: During his cooperation with Mr. Calvert, Mr. Berg devoted most of his time to helping him understand the records and wind down his businesses. Because his assets were largely frozen and unavailable he and Mr. Calvert discussed a "set-aside" to provide for Mr. Berg's living expenses and other ongoing commitments. Although this understanding was never reduced to writing, Mr. Berg relied upon it in making the wire transfer in question.

Paragraph 18: The manner in which the government has calculated loss amount remains a mystery to the defense and the defense has been stymied in its own attempt to do so by the lack of meaningful access to the bank data and operative software by which to interpret it. The stipulated facts within the plea agreement, which were based on rough estimates available at the time, are also at odds with your figures. The stipulation provides that Mr. Berg raised $280 million from approximately 500 investors and the victims' loss was "approximately $100 million". Amounts owed to investors are not the same thing as losses attributable to fraud, since investment or creditor loss could have been caused by adverse market forces (which were severely negative during the relevant time). Finally, the defense has not seen any substantiation of the $117.3 million figure purportedly spent on personal items and, therefore, objects to any figure above $100 million.

Paragraph 19: Largely because of our lack of access to Mr. Berg's accounting books, the identifiable victim count is difficult to determine and undoubtedly exaggerated

Letter to USPO Steven McNickle - page 4

by double counting of some of the same victims and the confusion of non-defrauded creditors of the bankruptcy estate with fraud victims. Again, the stipulated facts of the plea agreement refer to "approximately 500 investors in his investment funds" and a victims' loss amount of "approximately $100 million", but neither the stipulation nor the accessible records specify which of the investors were defrauded and which simply experienced a market loss. Likewise, we do not know how much particular investors may have recouped in paid-out interest (which should be credited against their principal lost) before they lost their principal investment.

Paragraphs 20 and 29 (obstruction of justice): Mr. Berg's attempts to cooperate and assist the government and the U.S. Bankruptcy trustee, initiated before government prosecutors were even aware of his case, were substantial and quite helpful. While he erred in withholding or falsely advancing material information, on balance his cooperation, which included a four-hour taped statement without standard proffer protection, substantially outweighed any purportedly obstructive conduct. In any case, he has been separately charged with bankruptcy fraud based on this very conduct. To now enhance him for obstruction would amount to double-counting.

To the extent any statements not constituting presently charged criminal conduct are considered, they must be construed in a light most favorable to the defendant. *United States v. Arnold*, 106 F.3d 37 (3d Cir. 1997). Even then, the court should require a heightened standard of proof of clear and convincing evidence to support an obstruction enhancement. *Id., United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997; *United States v. Montague*, 40 F.3d 1251 (D.C. Cir. 1994). Under the circumstances, a §3B1.1 obstruction enhancement should not apply.

Paragraph 21: We agree that Mr. Berg has easily accepted responsibility for his conduct by pleading guilty early and saving the court and government untold time and expense. Our bone of contention is now simply that he be held accountable for what he did and not for suspected conduct fueled by speculation and insufficient forensic analysis. Mr. Berg will either submit a written statement or make an extensive allocution at time of sentencing. His earlier desire to submit a statement has been hampered by the delay in production of the government's promised forensic report.

Paragraph 24: While we dispute the bold-faced loss amount (see paragraph 18 discussion above), we agree that the base offense level is 7.

Paragraph 25: For reasons already indicated, the fraud loss is no greater than the stipulated $100 million, so a 24-level enhancement applies, pursuant to USSG § 2B1.1(b)(1)(M). No enhancement should follow from misrepresentations during bankruptcy proceedings, per USSG § 2B1.1(b)(8)(b), since Mr. Berg is already being

Letter to USPO Steven McNickle - page 5

held accountable for the bankruptcy fraud to which he pled.  Otherwise, this is double-counting of that factor, and triple-counting if an obstruction enhancement applies.

Paragraph 28:  No enhancement for an abuse of trust, pursuant to § 3B1.3, should apply.  Mr. Berg was a very good salesman, but he did not possess any "special skill" as referenced in the guidelines.  Application note 4 to 3B1.3 defines the term as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."  Mr. Berg had none of these things.  Moreover, an ordinary abuse of trust is inherent in the wire fraud to which he pled.

Paragraphs 32, 34 and 81 (Total offense level):

  7   Base offense level

24  – loss between $50 million and $100 million

  6  – more than 250 victims

  1 – 18 USC 1957 conviction

– 3  acceptance of responsibility

35  – total offense level

Paragraph 69:  Based on a total offense level 35 and a criminal history category I, Mr. Berg's advisory guideline range is 168 to 210 months, but the issue is probably moot in light of the parties' Rule 11(c)(1)(C) binding sentencing agreement of eighteen years (216 months).

Paragraph 83:  Mr. Berg survived an abusive early childhood with an uncommon ambition to succeed and achieve the material things he had been denied earlier.  The attached letters from his sister, Wendy Siegel, and mother, Marleen Berg, provide compelling insights into his background and emotional makeup.  This is material to eventual conditions of supervised release and to program eligibility within the Bureau of Prisons, as well as providing a legal basis for a variance or departure from the guideline range.  Wendy Siegel writes:

...[Darren] longs for acceptance and friendship and feels that no one would ever give that to him freely.  He was raised in a family where nothing about him was accepted.  My father considered him a sissy and my stepfather was homophobic and barely tolerated Darren's presence in his house.  Although

Letter to USPO Steven McNickle - page 6

Darren had not admitted to being gay in high school my stepfather treated him like he was contagious, and did not hide the fact that he couldn't wait until he graduated and moved on.  My other brothers, Shane and Rory, took a lot of their anger out on Darren.  My father would beat them and in turn they would beat Darren.  He was close to my mother and I because we were the only people in the family who loved him for who he was, which was a talented, emotional boy yearning for a place where people would like him.  He left Grants Pass with the need to prove that he was worth the space he was taking up in this world.

Darren created an alternate world for himself early in his life.  The emotional and physical abuse that was happening in our household was simply too much for him to handle.  When he was three I remember observing him curled up in bed as chairs were flying, everyone was screaming, my father was beating my mother and the police were coming with sirens blaring.  I thought at that time that I would love to be able to shut out all of the unbelievable things that were happening.  I truly feared for my life and Darren was curled up in bed asleep.  I know now that this was the beginning of his mind shutting down.  The world we inhabited was too scary for him to navigate, so he went somewhere he could be safe.  When he was eight he created an alter ego named Rod Taylor.  He set up a desk, ordered a sign and "went into business".  Due to his limited knowledge of the world he chose to run a bus company because our paternal grandfather was a Greyhound bus driver who often talked about the bus business.  Rod Taylor was successful, admired and smart, everything Darren did not believe he was.  He spent hours in his "play" world and we considered him odd but endearingly cute.  If Darren had one true belief in childhood it was that Rod Taylor was invincible.  Rod would never fail, Rod was the smartest, the best and always knew what to do.  He was admired and people craved his attention and friendship...

Wendy Seigel letter, October 16, 2011.

Paragraph 85:  We agree that Mr. Berg's early, voluntary disclosure of his wrongdoing did much to mitigate its harm.  His bankruptcy attorney, Larry Reams, remarked that the value of his cooperation to the U.S. Bankruptcy Trustee in identifying and recovering assets for the investors greatly exceeded the detrimental impact of any subsequent deceptive conduct.

Paragraph 89:  We are glad you appreciate that the negotiated plea agreement's eighteen-year binding sentencing recommendation may be justified in light of other

Letter to USPO Steven McNickle - page 7

roughly comparable fraud cases in this district.  This agreement was the result of protracted negotiation that employed the talents of Magistrate Judge Kelly Arnold and Judge Coughenour and the blessing of plea judge Ricardo Martinez.  With their help and guidance, the parties resolved this case without the need to expend hundreds of thousands of dollars in technology and forensic financial expert services to calculate and retrace the financial events of Mr. Berg and his businesses.  The plea agreement contains a carefully crafted stipulated Statement of Facts that was intended to be the basis for the acceptance of this plea by Judge Jones and the imposition of the agreed sentence.  The stipulation reflects a compromise for both the government and Mr. Berg.  For Mr. Berg, it is a reflection of what we believe would likely be the worst-case depiction of his conduct if that matter went to trial.  There are grounds, as suggested above, that the loss amount is less than $100 million, but in the spirit of compromise Mr. Berg agreed to the stipulated facts.  The stipulated facts should therefore be the basis for your report and guideline calculations.

If you have questions about our position on your PSI, please do not hesitate to contact us.

Sincerely,

Michael Nance
Russell Aoki
Attorneys for Darren Berg

cc: Norman Barbosa,  AUSA
     Darren Berg