Honorable Richard Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>     v.<br><br>FREDERICK DARREN BERG,<br><br>                Defendant. | No. CR 10-310 RAJ<br><br>SUPPLEMENT TO DEFENSE SENTENCING MEMORANDUM |

Defendant Darren Berg, by and through his undersigned attorneys, hereby supplements his previously filed sentencing memorandum.

**The government's calculations exaggerate the loss amount from Mr. Berg's fraud because they do not account for market loss or his own equity participation in his investment funds. Rather than engage in a tortured analysis, the court should simply adopt the $100 million loss amount from the plea agreement and apply a 24 level loss enhancement.**

### Factual background

For many years Mr. Berg ran several successful businesses, including tour bus companies that serviced the Western United States and Canada and a series of mortgage-secured investment funds. Between 2001 and mid-2010 he created and operated a series of investment funds, designated as Meridian Mortgage Investors Funds 1, 2, 3, 5, 6, 7, 8,

MICHAEL NANCE
ATTORNEY AT LAW
615 SECOND AVENUE, SUITE 760
SEATTLE, WASHINGTON 98104
(206) 624-3211

9 and 10 and Meridian Real Estate Opportunity Funds 1 and 2, among others, for the stated purpose of investing in seller financed real estate contracts, hard money loans, real estate and mortgage backed securities.  During that period, Mr. Berg raised about $350 million from numerous investors and pooled it into the various funds along with his own equity in the funds.  The marketing of the investment funds was handled by the trio of Dennis Shay, Gary Brown, and Bill Jeude, who personally contracted with each of the investors and held an aggregate 40% equity stake in the profits of the business.  All of the investors they solicited were each required to sign an accreditation statement, attesting to a minimum net financial worth and their suitability as investors in higher risk investments.   Mr. Berg never met many of the investors and generally relied on his these marketers to properly screen them.

  Generally, after an investor signed the accreditation statement and subscription agreement, he/she paid money to Mr. Berg who credited the investor for that amount in the selected fund which was comprised of the secured notes.  Mr. Berg profited by paying a discount off the face value of the note (usually about 10-15% less) to the original seller and by pocketing the interest differential between the stated rate of the note and a lesser rate negotiated with the investor.  The funds generated periodic interest income which, at the investors' discretion, was either paid out to investors or re-invested in the fund.  The system was designed to profit all participants, provided the original borrowerers

MICHAEL NANCE
ATTORNEY AT LAW
615 SECOND AVENUE, SUITE 760
SEATTLE, WASHINGTON 98104
(206) 624-3211

continued to make their payments and the underlying properties maintained their value.

At some point, investment money intended for placement in the funds was instead diverted for other purposes not authorized by or known to the investors: to Mr. Berg's private tour bus companies[1] or to his own personal accounts for non-investment purposes. The current accounting does not determine precisely when his personal equity accounts in particular investment funds became negative and, therefore, the number of investors and amount of loss attributable to his fraudulent diversions are difficult to quantify, but they are substantial. By any account, by 2008 or 2009 the investment funds had reached a crisis point following severe adverse turns in the real estate market, the triggering of massive defaults on the seller-financed notes constituting the investment funds, and the call by many investors for redemptions. Because of prior wrongful diversions from these funds and massive losses from plummeting values on properties securing the notes within the funds (and consequent defaults on those notes when the borrowers quit paying on them, a fact aggravated by a dead market for recouping any money through foreclosure sales), the funds were insolvent. To cover the shortfall Mr. Berg became actively engaged in Ponzi-type activity, that is, the paying off of seasoned investors with money

---

[1] Mr. Berg's tour bus companies included Meridian Transportation Resources (Canada), Ltd., Meridian Transportation Resources (California), LLC, Meridian Transportation Resources, LLC, and Oregon Coachways, Inc. All of these entities eventually became part of Mr. Berg's personal bankruptcy estate.

from new investors.

    To reconstruct events, the government commissioned the compilation of a recently completed Excel 124,000-line spreadsheet that details and categorizes transactions from the many bank accounts under the control of Mr. Berg during the relevant period of this investigation.[2]  The spreadsheet reflects that Mr. Berg's investment funds closed 717 mortgage purchase transactions in their opening 36 months – roughly a closing every business day.  Mr. Berg estimates the total closer to 800 mortgages since some of those closings were for multiple mortgages (one of them, with Orchard Bank, was for 40 mortgages for approximately $1.6 million).[3]   Between the years 2001-2006 the spreadsheet reflects that approximately $13 million in interest was paid to investors.[4]

## Legal analysis

    "Loss" under USSG § 2B1.1 is the greater of "actual loss" or "intended loss". Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  Intended loss is "the pecuniary harm that was intended to result from the

---

[2]The defense requests that the Excel spreadsheet, in its electronic form, be made part of the record.

[3]This is determined from withdrawals from the "loan portfolio" portion of the spreadsheet and includes their number, their total amount, and their average amount.

[4]This is determined by totaling the top line of the government's Excel spreadsheet titled "Payments Paid to Investors" for each month of the year 2001 through and including 2006.

MICHAEL NANCE
ATTORNEY AT LAW
615 SECOND AVENUE, SUITE 760
SEATTLE, WASHINGTON 98104
(206) 624-3211

offense." USSG § 2B1.1, cmt. n.3(A).  In making a loss calculation, the court must distinguish between complete sham transactions, in which nothing is given in exchange for an investor's money, and a scheme involving legitimate securities or other property that has a value less than that represented.  See *United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007), in which a "pump and dump" scheme involving the sale of stock of a legitimate company whose shares had been inflated by false representations required careful analysis to separate the fraud from other factors in the investors' losses.  Because the involved companies were not entirely sham operations, the court had to disentangle the underlying value of the stock, inflation of the value of the stock due to fraud, and either inflation or deflation of that value due to unrelated causes.  *Id.*, at 718.

     Similarly, victim losses due to market forces should not be part of the fraud loss amount for guideline purposes.  A district court errs in accepting as reasonable an estimate of loss amount for sentencing purposes that fails to offset for losses attributable to market forces and unrelated to the defendant's fraud.  *United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010).  Applying the logic of *Zolp*, *Laurienti* faulted the trial court for failing to account for the market forces contributing to the decrease in stock value.  "It is undeniable that, in addition to the fraud, the market's drop in 2000 had an effect on stock values." *Id* at 558.   Rejecting a government argument that its own loss amount calculations leaned "grossly in defendant's favor in at least three ways", the court

MICHAEL NANCE
ATTORNEY AT LAW
615 SECOND AVENUE, SUITE 760
SEATTLE, WASHINGTON 98104
(206) 624-3211

continued:

> We acknowledge that the loss calculation need only be a reasonable estimate. In the context of this case, though, we are unpersuaded that the 'reasonable estimate' requirement allows us to overlook the district court's many errors, particularly because many of the errors suffer from logical defects. All methodologies for estimation have inherent imperfections; otherwise they would be precise calculations, not estimates. So long as those imperfections are logical and are not prone to overwhelming the final result, they are permissible. But where, as here, the imperfections are illogical, such as the failure to offset gains in certain house stocks, it is impossible to tell whether the ultimate estimate is reasonable or not.

*Id.,* at 559.

Because Mr. Berg's business had a legitimate beginning or component, as the accounting indicates, as Mr. Berg has always insisted, and as even the government now seems to acknowledge (Govt. Sentencing Mem. p 2, lines 7-8), it is incumbent on the court to separate investor losses arising from adverse market forces from Mr. Berg's fraudulent activities, per *Zolp* and *Laurenti*. Victim losses that resulted from Mr. Berg's use of their money to pay off earlier investors' redemptions are clearly attributable to him. But losses from investments that were legitimately credited to the funds when they were made and only later became worthless after the market turned are at least partially due to market forces and not Mr. Berg's fraud. Additionally, Mr. Berg contends that expenditures from the funds for his personal use – even for his extravagances or diversions to his private bus companies – are only fraudulent if the particular fund from which they were paid had a negative equity balance at the time. To fairly analyze and

apportion the losses, each of the investment funds would need to be reconciled at the time of the expenditures in question to determine the value of its assets compared with its liabilities. Only if Mr. Berg's equity stake in the fund was negative at the time would the expenditure be fairly attributable to him as fraudulent.

## Conclusion

The available banking records of Mr. Berg's business, less than complete and not fully distilled, still suggest a once-successful, legitimate business. Individual, compartmentalized investment funds, never reconciled to evaluate the propriety of Mr. Berg's personal expenditures, leaves the government condemnation of those expenditures unproven. Fund investor losses following the most severe market meltdown since the Great Depression have multiple causes, only one of which was Mr. Berg's fraudulent activity. Untangling the legitimate from the illegitimate would be a monumental task and not possible from the forensic effort expended thus far.

For these reasons, the court should simply find a loss amount of less than $100 million, correlating to an enhancement of 24 levels.

Respectfully submitted this 8th day of February, 2012.

/s/ Michael Nance
/s/ Russell Aoki
Defense Attorneys

**Certificate of Service**

I hereby certify that on the 8th day of February, 2012, I electronically filed the foregoing with the clerk of the court using the CM/ECF system.  Notice of this filing will be sent electronically to counsel of record for other parties.

/s/ Michael Nance, WSBA # 13933
Email: minance@aol.com
Attorney for defendant

MICHAEL NANCE
ATTORNEY AT LAW
615 SECOND AVENUE, SUITE 760
SEATTLE, WASHINGTON 98104
(206) 624-3211